## CITY OF AKRON v. AKRON CENTER FOR REPRODUCTIVE HEALTH, INC., ET AL.

No. 81–746. Argued November 30, 1982—Decided June 15, 1983*

---

*Together with No. 81–1172, *Akron Center for Reproductive Health, Inc., et al.* v. *City of Akron et al.*, also on certiorari to the same court.

418

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which WHITE and REHNQUIST, JJ., joined, *post*, p. 452.

*Alan G. Segedy* argued the cause for petitioner in No. 81–746 and respondent in No. 81–1172. With him on the briefs was *Robert D. Pritt.* Mr. Segedy and *Robert A. Destro* filed a brief for Seguin et al., respondents under this Court's Rule 19.6, in support of petitioner in No. 81–746 and respondent in No. 81–1172.

*Solicitor General Lee* argued the cause for the United States as *amicus curiae.* With him on the brief were *Assistant Attorney General McGrath* and *Deputy Solicitor General Geller.*

*Stephan Landsman* argued the cause for respondents in No. 81–746 and petitioners in No. 81–1172. With him on the briefs were *Janet Benshoof, Suzanne M. Lynn, Nan D. Hunter, Lois J. Lipton,* and *Gordon Beggs.*†

†Briefs of *amici curiae* urging reversal were filed by *Delores V. Horan* for Feminists for Life; and by *Lynn D. Wardle* for the United Families Foundation et al.

Briefs of *amici curiae* urging affirmance were filed by *Bruce J. Ennis, Jr.,* and *Donald N. Bersoff* for the American Psychological Association;

JUSTICE POWELL delivered the opinion of the Court.

In this litigation we must decide the constitutionality of several provisions of an ordinance enacted by the city of Akron, Ohio, to regulate the performance of abortions. Today we also review abortion regulations enacted by the State of Missouri, see *Planned Parenthood Assn. of Kansas City, Mo., Inc.* v. *Ashcroft, post,* p. 476, and by the State of Virginia, see *Simopoulos* v. *Virginia, post,* p. 506.

These cases come to us a decade after we held in *Roe* v. *Wade,* 410 U. S. 113 (1973), that the right of privacy, grounded in the concept of personal liberty guaranteed by the Constitution, encompasses a woman's right to decide whether to terminate her pregnancy. Legislative responses to the Court's decision have required us on several occasions, and again today, to define the limits of a State's authority to regulate the performance of abortions. And arguments continue to be made, in these cases as well, that we erred in interpreting the Constitution. Nonetheless, the doctrine of

and by *Sylvia A. Law, Nadine Taub,* and *Ellen J. Winner* for the Committee for Abortion Rights and Against Sterilization Abuse et al.

Briefs of *amici curiae* were filed by *M. Carolyn Cox* and *Lynn Bregman* for the American College of Obstetricians and Gynecologists et al.; by *David B. Hopkins* for the American Public Health Association; by *Dennis J. Horan, Victor G. Rosenblum, Patrick A. Trueman,* and *Thomas J. Marzen* for Americans United for Life; for California Women Lawyers et al.; by *Charles E. Rice* for the Catholic League for Religious and Civil Rights; by *Rhonda Copelon* for Certain Religious Organizations; by *Jack R. Bierig* for the College of American Pathologists; by *Ronald J. Suster* for Lawyers for Life; by *Alan Ernest* for the Legal Defense Fund for Unborn Children; by *Judith Levin* for the National Abortion Federation; by *Jack Greenberg, James M. Nabrit III,* and *Judith Reed* for the NAACP Legal Defense and Educational Fund, Inc.; by *Phyllis N. Segal, Judith I. Avner,* and *Jemera Rone* for the National Organization for Women et al.; by *Eve W. Paul* and *Dara Klassel* for the Planned Parenthood Federation of America, Inc.,* et al.; by *James-Arthur Gleason* for Womankind, Inc.; by *Nancy Reardan* for Women Lawyers of Sacramento et al; and by *Susan Frelich Appleton* and *Paul Brest* for Certain Law Professors.

420

*stare decisis*, while perhaps never entirely persuasive on a constitutional question, is a doctrine that demands respect in a society governed by the rule of law.[1]   We respect it today, and reaffirm *Roe* v. *Wade*.

---

[1] There are especially compelling reasons for adhering to *stare decisis* in applying the principles of *Roe* v. *Wade*.   That case was considered with special care.   It was first argued during the 1971 Term, and reargued— with extensive briefing—the following Term.   The decision was joined by THE CHIEF JUSTICE and six other Justices.   Since *Roe* was decided in January 1973, the Court repeatedly and consistently has accepted and applied the basic principle that a woman has a fundamental right to make the highly personal choice whether or not to terminate her pregnancy.   See *Connecticut* v. *Menillo*, 423 U. S. 9 (1975); *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52 (1976); *Bellotti* v. *Baird*, 428 U. S. 132 (1976); *Beal* v. *Doe*, 432 U. S. 438 (1977); *Maher* v. *Roe*, 432 U. S. 464 (1977); *Colautti* v. *Franklin*, 439 U. S. 379 (1979); *Bellotti* v. *Baird*, 443 U. S. 622 (1979); *Harris* v. *McRae*, 448 U. S. 297 (1980); *H. L.* v. *Matheson*, 450 U. S. 398 (1981).

Today, however, the dissenting opinion rejects the basic premise of *Roe* and its progeny.   The dissent stops short of arguing flatly that *Roe* should be overruled.   Rather, it adopts reasoning that, for all practical purposes, would accomplish precisely that result.   The dissent states that "[e]ven assuming that there is a fundamental right to terminate pregnancy in some situations," the State's compelling interests in maternal health and potential human life "are present *throughout* pregnancy."   *Post*, at 459 (emphasis in original).   The existence of these compelling interests turns out to be largely unnecessary, however, for the dissent does not think that even one of the numerous abortion regulations at issue imposes a sufficient burden on the "limited" fundamental right, *post*, at 465, n. 10, to require heightened scrutiny.   Indeed, the dissent asserts that, regardless of cost, "[a] health regulation, such as the hospitalization requirement, simply does not rise to the level of 'official interference' with the abortion decision."   *Post*, at 467 (quoting *Harris* v. *McRae*, *supra*, at 328 (WHITE, J., concurring)).   The dissent therefore would hold that a requirement that all abortions be performed in an acute-care, general hospital does not impose an unacceptable burden on the abortion decision.   It requires no great familiarity with the cost and limited availability of such hospitals to appreciate that the effect of the dissent's views would be to drive the performance of many abortions back underground free of effective regulation and often without the attendance of a physician.

In sum, it appears that the dissent would uphold virtually any abortion regulation under a rational-basis test.   It also appears that even where

# I

In February 1978 the City Council of Akron enacted Ordinance No. 160–1978, entitled "Regulation of Abortions."[2]

---

heightened scrutiny is deemed appropriate, the dissent would uphold virtually any abortion-inhibiting regulation because of the State's interest in preserving potential human life. See *post*, at 474 (arguing that a 24-hour waiting period is justified in part because the abortion decision "has grave consequences for the fetus"). This analysis is wholly incompatible with the existence of the fundamental right recognized in *Roe* v. *Wade*.

[2] The ordinance was prefaced by several findings:

"WHEREAS, the citizens of Akron are entitled to the highest standard of health care; and

"WHEREAS, abortion is a major surgical procedure which can result in complications, and adequate equipment and personnel should be required for its safe performance in order to insure the highest standards of care for the protection of the life and health of the pregnant woman; and

"WHEREAS, abortion should be performed only in a hospital or in such other special outpatient facility offering the maximum safeguards to the life and health of the pregnant woman; and

"WHEREAS, it is the finding of Council that there is no point in time between the union of sperm and egg, or at least the blastocyst stage and the birth of the infant at which point we can say the unborn child is not a human life, and that the changes occurring between implantation, a six-weeks embryo, a six-month fetus, and a one-week-old child, or a mature adult are merely stages of development and maturation; and

"WHEREAS, traditionally the physician has been responsible for the welfare of both the pregnant woman and her unborn child, and that while situations of conflict may arise between a pregnant woman's health interests and the welfare of her unborn child, the resolution of such conflicts by inducing abortion in no way implies that the physician has an adversary relationship towards the unborn child; and

"WHEREAS, Council therefore wishes to affirm that the destruction of the unborn child is not the primary purpose of abortion and that consequently Council recognizes a continuing obligation on the part of the physician towards the survival of a viable unborn child where this obligation can be discharged without additional hazard to the health of the pregnant woman; and

"WHEREAS, Council, after extensive public hearings and investigations concludes that enactment of this ordinance is a reasonable and prudent action which will significantly contribute to the preservation of the public life, health, safety, morals, and welfare." Akron Ordinance No. 160–1978.

The ordinance sets forth 17 provisions that regulate the performance of abortions, see Akron Codified Ordinances, ch. 1870, 5 of which are at issue in this case:

(i) Section 1870.03 requires that all abortions performed after the first trimester of pregnancy be performed in a hospital.[3]

(ii) Section 1870.05 sets forth requirements for notification of and consent by parents before abortions may be performed on unmarried minors.[4]

---

[3] "1870.03   ABORTION IN HOSPITAL

"No person shall perform or induce an abortion upon a pregnant woman subsequent to the end of the first trimester of her pregnancy, unless such abortion is performed in a hospital."

Section 1870.01(B) defines "hospital" as "a general hospital or special hospital devoted to gynecology or obstetrics which is accredited by the Joint Commission on Accreditation of Hospitals or by the American Osteopathic Association."

[4] "1870.05   NOTICE AND CONSENT

"(A) No physician shall perform or induce an abortion upon an unmarried pregnant woman under the age of 18 years without first having given at least twenty-four (24) hours actual notice to one of the parents or the legal guardian of the minor pregnant woman as to the intention to perform such abortion, or if such parent or guardian cannot be reached after a reasonable effort to find him or her, without first having given at least seventy-two (72) hours constructive notice to one of the parents or the legal guardian of the minor pregnant woman by certified mail to the last known address of one of the parents or guardian, computed from the time of mailing, unless the abortion is ordered by a court having jurisdiction over such minor pregnant woman.

"(B) No physician shall perform or induce an abortion upon a minor pregnant woman under the age of fifteen (15) years without first having obtained the informed written consent of the minor pregnant woman in accordance with Section 1870.06 of this Chapter, and

"(1) First having obtained the informed written consent of one of her parents or her legal guardian in accordance with Section 1870.06 of this Chapter, or

"(2) The minor pregnant woman first having obtained an order from a court having jurisdiction over her that the abortion be performed or induced."

(iii) Section 1870.06 requires that the attending physician make certain specified statements to the patient "to insure that the consent for an abortion is truly informed consent."[5]

---

[5] "1870.06 INFORMED CONSENT

"(A) An abortion otherwise permitted by law shall be performed or induced only with the informed written consent of the pregnant woman, and one of her parents or her legal guardian whose consent is required in accordance with Section 1870.05(B) of this Chapter, given freely and without coercion.

"(B) In order to insure that the consent for an abortion is truly informed consent, an abortion shall be performed or induced upon a pregnant woman only after she, and one of her parents or her legal guardian whose consent is required in accordance with Section 1870.05(B) of this Chapter, have been orally informed by her attending physician of the following facts, and have signed a consent form acknowledging that she, and the parent or legal guardian where applicable, have been informed as follows:

"(1) That according to the best judgment of her attending physician she is pregnant.

"(2) The number of weeks elapsed from the probable time of the conception of her unborn child, based upon the information provided by her as to the time of her last menstrual period or after a history and physical examination and appropriate laboratory tests.

"(3) That the unborn child is a human life from the moment of conception and that there has been described in detail the anatomical and physiological characteristics of the particular unborn child at the gestational point of development at which time the abortion is to be performed, including, but not limited to, appearance, mobility, tactile sensitivity, including pain, perception or response, brain and heart function, the presence of internal organs and the presence of external members.

"(4) That her unborn child may be viable, and thus capable of surviving outside of her womb, if more than twenty-two (22) weeks have elapsed from the time of conception, and that her attending physician has a legal obligation to take all reasonable steps to preserve the life and health of her viable unborn child during the abortion.

"(5) That abortion is a major surgical procedure which can result in serious complications, including hemorrhage, perforated uterus, infection, menstrual disturbances, sterility and miscarriage and prematurity in subsequent pregnancies; and that abortion may leave essentially unaffected or may worsen any existing psychological problems she may have, and can result in severe emotional disturbances.

(iv) Section 1870.07 requires a 24-hour waiting period between the time the woman signs a consent form and the time the abortion is performed.[6]

(v) Section 1870.16 requires that fetal remains be "disposed of in a humane and sanitary manner."[7]

---

"(6) That numerous public and private agencies and services are available to provide her with birth control information, and that her physician will provide her with a list of such agencies and the services available if she so requests.

"(7) That numerous public and private agencies and services are available to assist her during pregnancy and after the birth of her child, if she chooses not to have the abortion, whether she wishes to keep her child or place him or her for adoption, and that her physician will provide her with a list of such agencies and the services available if she so requests.

"(C) At the same time the attending physician provides the information required by paragraph (B) of this Section, he shall, at least orally, inform the pregnant woman, and one of her parents or her legal guardian whose consent is required in accordance with Section 1870.05(B) of this Chapter, of the particular risks associated with her own pregnancy and the abortion technique to be employed including providing her with at least a general description of the medical instructions to be followed subsequent to the abortion in order to insure her safe recovery, and shall in addition provide her with such other information which in his own medical judgment is relevant to her decision as to whether to have an abortion or carry her pregnancy to term.

"(D) The attending physician performing or inducing the abortion shall provide the pregnant woman, or one of her parents or legal guardian signing the consent form where applicable, with a duplicate copy of the consent form signed by her, and one of her parents or her legal guardian where applicable, in accordance with paragraph (B) of this Section."

[6] "1870.07 WAITING PERIOD

"No physician shall perform or induce an abortion upon a pregnant woman until twenty-four (24) hours have elapsed from the time the pregnant woman, and one of her parents or her legal guardian whose consent is required in accordance with Section 1870.05(B) of this Chapter, have signed the consent form required by Section 1870.06 of this Chapter, and the physician so certifies in writing that such time has elapsed."

[7] "1870.16 DISPOSAL OF REMAINS

"Any physician who shall perform or induce an abortion upon a pregnant woman shall insure that the remains of the unborn child are disposed of in a humane and sanitary manner."

A violation of any section of the ordinance is punishable as a criminal misdemeanor. § 1870.18. If any provision is invalidated, it is to be severed from the remainder of the ordinance.[8] The ordinance became effective on May 1, 1978.

On April 19, 1978, a lawsuit challenging virtually all of the ordinance's provisions was filed in the District Court for the Northern District of Ohio. The plaintiffs, respondents and cross-petitioners in this Court, were three corporations that operate abortion clinics in Akron and a physician who has performed abortions at one of the clinics. The defendants, petitioners and cross-respondents here, were the city of Akron and three city officials (Akron). Two individuals (intervenors) were permitted to intervene as codefendants "in their individual capacity as parents of unmarried minor daughters of childbearing age." 479 F. Supp. 1172, 1181 (1979). On April 27, 1978, the District Court preliminarily enjoined enforcement of the ordinance.

In August 1979, after hearing evidence, the District Court ruled on the merits. It found that plaintiffs lacked standing to challenge seven provisions of the ordinance, none of which is before this Court. The District Court invalidated four provisions, including § 1870.05 (parental notice and consent), § 1870.06(B) (requiring disclosure of facts concerning the woman's pregnancy, fetal development, the complications of abortion, and agencies available to assist the woman), and § 1870.16 (disposal of fetal remains). The court upheld the constitutionality of the remainder of the ordinance, including § 1870.03 (hospitalization for abortions after the first trimester), § 1870.06(C) (requiring disclosure of the particular risks of the woman's pregnancy and the abortion technique to be employed), and § 1870.07 (24-hour waiting period).

---

[8] "1870.19   SEVERABILITY

"Should any provision of this Chapter be construed by any court of law to be invalid, illegal, unconstitutional, or otherwise unenforcible, such invalidity, illegality, unconstitutionality, or unenforcibility shall not extend to any other provision or provisions of this Chapter."

All parties appealed some portion of the District Court's judgment. The Court of Appeals for the Sixth Circuit affirmed in part and reversed in part. 651 F. 2d 1198 (1981). It affirmed the District Court's decision that § 1870.03's hospitalization requirement is constitutional. It also affirmed the ruling that §§ 1870.05, 1870.06(B), and 1870.16 are unconstitutional. The Court of Appeals reversed the District Court's decision on §§ 1870.06(C) and 1870.07, finding these provisions to be unconstitutional.

Three separate petitions for certiorari were filed. In light of the importance of the issues presented, and in particular the conflicting decisions as to whether a State may require that all second-trimester abortions be performed in a hospital,[9] we granted both Akron's and the plaintiffs' petitions. 456 U. S. 988 (1982). We denied the intervenors' petition, *Seguin* v. *Akron Center for Reproductive Health, Inc.*, 456 U. S. 989 (1982), but they have participated in this Court as respondents under our Rule 19.6. We now reverse the judgment of the Court of Appeals upholding Akron's hospitalization requirement, but affirm the remainder of the decision invalidating the provisions on parental consent, informed consent, waiting period, and disposal of fetal remains.

II

In *Roe* v. *Wade*, the Court held that the "right of privacy, . . . founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." 410 U. S., at 153. Although the Constitution does not specifically identify this right, the

---

[9] Compare *Planned Parenthood Assn. of Kansas City, Mo., Inc.* v. *Ashcroft*, 655 F. 2d 848 (CA8), supplemented, 664 F. 2d 687 (CA8 1981) (invalidating hospital requirement), with *Simopoulos* v. *Commonwealth*, 221 Va. 1059, 277 S. E. 2d 194 (1981) (upholding hospital requirement). Numerous States require that second-trimester abortions be performed in hospitals. See Brief for Americans United for Life as *Amicus Curiae* in *Simopoulos* v. *Virginia*, O. T. 1982, No. 81–185, p. 4, n. 1 (listing 23 States).

history of this Court's constitutional adjudication leaves no doubt that "the full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution." *Poe* v. *Ullman,* 367 U. S. 497, 543 (1961) (Harlan, J., dissenting from dismissal of appeal). Central among these protected liberties is an individual's "freedom of personal choice in matters of marriage and family life." *Roe,* 410 U. S., at 169 (Stewart, J., concurring). See, *e. g., Eisenstadt* v. *Baird,* 405 U. S. 438 (1972); *Loving* v. *Virginia,* 388 U. S. 1 (1967); *Griswold* v. *Connecticut,* 381 U. S. 479 (1965); *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925); *Meyer* v. *Nebraska,* 262 U. S. 390 (1923). The decision in *Roe* was based firmly on this long-recognized and essential element of personal liberty.

The Court also has recognized, because abortion is a medical procedure, that the full vindication of the woman's fundamental right necessarily requires that her physician be given "the room he needs to make his best medical judgment." *Doe* v. *Bolton,* 410 U. S. 179, 192 (1973). See *Whalen* v. *Roe,* 429 U. S. 589, 604–605, n. 33 (1977). The physician's exercise of this medical judgment encompasses both assisting the woman in the decisionmaking process and implementing her decision should she choose abortion. See *Colautti* v. *Franklin,* 439 U. S. 379, 387 (1979).

At the same time, the Court in *Roe* acknowledged that the woman's fundamental right "is not unqualified and must be considered against important state interests in abortion." *Roe,* 410 U. S., at 154. But restrictive state regulation of the right to choose abortion, as with other fundamental rights subject to searching judicial examination, must be supported by a compelling state interest. *Id.,* at 155. We have recognized two such interests that may justify state regulation of abortions.[10]

---

[10] In addition, the Court repeatedly has recognized that, in view of the unique status of children under the law, the States have a "significant" in-

First, a State has an "important and legitimate interest in protecting the potentiality of human life." *Id.*, at 162. Although this interest exists "throughout the course of the woman's pregnancy," *Beal* v. *Doe*, 432 U. S. 438, 446 (1977), it becomes compelling only at viability, the point at which the fetus "has the capability of meaningful life outside the mother's womb," *Roe, supra*, at 163. See *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52, 63–65 (1976). At viability this interest in protecting the potential life of the unborn child is so important that the State may proscribe abortions altogether, "except when it is necessary to preserve the life or health of the mother." *Roe*, 410 U. S., at 164.

Second, because a State has a legitimate concern with the health of women who undergo abortions, "a State may properly assert important interests in safeguarding health [and]

---

terest in certain abortion regulations aimed at protecting children "that is not present in the case of an adult." *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S., at 75. See *Carey* v. *Population Services International*, 431 U. S. 678, 693, n. 15 (1977) (plurality opinion). The right of privacy includes "independence in making certain kinds of important decisions," *Whalen* v. *Roe*, 429 U. S. 589, 599–600 (1977), but this Court has recognized that many minors are less capable than adults of making such important decisions. See *Bellotti* v. *Baird*, 443 U. S., at 633–635 *(Bellotti II)* (plurality opinion); *Danforth, supra*, at 102 (STEVENS, J., concurring in part and dissenting in part). Accordingly, we have held that the States have a legitimate interest in encouraging parental involvement in their minor children's decision to have an abortion. See *H. L.* v. *Matheson*, 450 U. S. 398 (1981) (parental notice); *Bellotti II, supra*, at 639, 648 (plurality opinion) (parental consent). A majority of the Court, however, has indicated that these state and parental interests must give way to the constitutional right of a mature minor or of an immature minor whose best interests are contrary to parental involvement. See, *e. g., Matheson*, 450 U. S., at 420 (POWELL, J., concurring); *id.*, at 450–451 (MARSHALL, J., dissenting). The plurality in *Bellotti II* concluded that a State choosing to encourage parental involvement must provide an alternative procedure through which a minor may demonstrate that she is mature enough to make her own decision or that the abortion is in her best interest. See *Bellotti II, supra*, at 643–644.

in maintaining medical standards." *Id.*, at 154. We held in *Roe*, however, that this health interest does not become compelling until "approximately the end of the first trimester" of pregnancy.[11] *Id.*, at 163. Until that time, a pregnant woman must be permitted, in consultation with her physi-

---

[11] *Roe* identified the end of the first trimester as the compelling point because until that time—according to the medical literature available in 1973—"mortality in abortion may be less than mortality in normal childbirth." 410 U. S., at 163. There is substantial evidence that developments in the past decade, particularly the development of a much safer method for performing second-trimester abortions, see *infra*, at 435–437, have extended the period in which abortions are safer than childbirth. See, *e. g.*, LeBolt, Grimes, & Cates, Mortality From Abortion and Childbirth: Are the Populations Comparable?, 248 J. A. M. A. 188, 191 (1982) (abortion may be safer than childbirth up to gestational ages of 16 weeks).

We think it prudent, however, to retain *Roe*'s identification of the beginning of the second trimester as the approximate time at which the State's interest in maternal health becomes sufficiently compelling to justify significant regulation of abortion. We note that the medical evidence suggests that until approximately the end of the first trimester, the State's interest in maternal health would not be served by regulations that restrict the manner in which abortions are performed by a licensed physician. See, *e. g.*, American College of Obstetricians and Gynecologists (ACOG), Standards for Obstetric-Gynecologic Services 54 (5th ed. 1982) (hereinafter ACOG Standards) (uncomplicated abortions generally may be performed in a physician's office or an outpatient clinic up to 14 weeks from the first day of the last menstrual period); ACOG Technical Bulletin No. 56, Methods of Mid-Trimester Abortion 4 (Dec. 1979) ("Regardless of advances in abortion technology, midtrimester terminations will likely remain more hazardous, expensive, and emotionally disturbing for women than earlier abortions").

The *Roe* trimester standard thus continues to provide a reasonable legal framework for limiting a State's authority to regulate abortions. Where the State adopts a health regulation governing the performance of abortions during the second trimester, the determinative question should be whether there is a reasonable medical basis for the regulation. See *Roe*, 410 U. S., at 163. The comparison between abortion and childbirth mortality rates may be relevant only where the State employs a health rationale as a justification for a complete prohibition on abortions in certain circumstances. See *Danforth, supra*, at 78–79 (invalidating state ban on saline abortions, a method that was "safer, with respect to maternal mortality, than even continuation of the pregnancy until normal childbirth").

cian, to decide to have an abortion and to effectuate that decision "free of interference by the State."[12]   *Ibid.*

This does not mean that a State never may enact a regulation touching on the woman's abortion right during the first weeks of pregnancy.   Certain regulations that have no significant impact on the woman's exercise of her right may be permissible where justified by important state health objectives.   In *Danforth, supra,* we unanimously upheld two Missouri statutory provisions, applicable to the first trimester, requiring the woman to provide her informed written consent to the abortion and the physician to keep certain records, even though comparable requirements were not imposed on most other medical procedures.   See 428 U. S., at 65–67, 79–81.   The decisive factor was that the State met its burden of demonstrating that these regulations furthered important health-related state concerns.[13]   But even these minor regulations on the abortion procedure during the first trimester may not interfere with physician-patient consultation or with the woman's choice between abortion and childbirth.   See *id.,* at 81.

From approximately the end of the first trimester of pregnancy, the State "may regulate the abortion procedure to the extent that the regulation reasonably relates to the preserva-

[12] Of course, the State retains an interest in ensuring the validity of *Roe*'s factual assumption that "the first trimester abortion [is] as safe for the woman as normal childbirth at term," an assumption that "holds true only if the abortion is performed by medically competent personnel under conditions insuring maximum safety for the woman." *Connecticut* v. *Menillo,* 423 U. S. 9, 11 (1975) *(per curiam).*   On this basis, for example, it is permissible for the States to impose criminal sanctions on the performance of an abortion by a nonphysician.   *Ibid.*

[13] For example, we concluded that recordkeeping, "if not abused or overdone, can be useful to the State's interest in protecting the health of its female citizens, and may be a resource that is relevant to decisions involving medical experience and judgment." 428 U. S., at 81.   See *infra,* at 443–445 (discussing the State's interest in requiring informed consent).

tion and protection of maternal health." [14]  *Roe,* 410 U. S., at 163.   The State's discretion to regulate on this basis does not, however, permit it to adopt abortion regulations that depart from accepted medical practice.   We have rejected a State's attempt to ban a particular second-trimester abortion procedure, where the ban would have increased the costs and limited the availability of abortions without promoting important health benefits.   See *Danforth,* 428 U. S., at 77–78.   If a State requires licensing or undertakes to regulate the performance of abortions during this period, the health standards adopted must be "legitimately related to the objective the State seeks to accomplish."   *Doe,* 410 U. S., at 195.

### III

Section 1870.03 of the Akron ordinance requires that any abortion performed "upon a pregnant woman subsequent to the end of the first trimester of her pregnancy" [15] must be

---

[14] "Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like."   *Roe, supra,* at 163–164.

[15] The Akron ordinance does not define "first trimester," but elsewhere suggests that the age of the fetus should be measured from the date of conception.   See § 1870.06(B)(2) (physician must inform woman of the number of weeks elapsed since conception); § 1870.06(B)(4) (physician must inform woman that a fetus may be viable after 22 weeks from conception).   An average pregnancy lasts approximately 38 weeks from the time of conception or, as more commonly measured, 40 weeks from the beginning of the woman's last menstrual period.   Under both methods there may be more than a 2-week deviation either way.

Because of the approximate nature of these measurements, there is no certain method of delineating "trimesters."   Frequently, the first trimester is estimated as 12 weeks following conception, or 14 weeks following the last menstrual period.   We need not attempt to draw a precise line, as this Court—for purposes of analysis—has identified the "compelling point" for the State's interest in health as "approximately the end of the first tri-

"performed in a hospital." A "hospital" is "a general hospital or special hospital devoted to gynecology or obstetrics which is accredited by the Joint Commission on Accreditation of Hospitals or by the American Osteopathic Association." § 1870.01(B). Accreditation by these organizations requires compliance with comprehensive standards governing a wide variety of health and surgical services.[16] The ordinance thus prevents the performance of abortions in outpatient facilities that are not part of an acute-care, full-service hospital.[17]

In the District Court plaintiffs sought to demonstrate that this hospitalization requirement has a serious detrimental impact on a woman's ability to obtain a second-trimester abortion in Akron and that it is not reasonably related to the State's interest in the health of the pregnant woman. The District Court did not reject this argument, but rather found the evidence "not . . . so convincing that it is willing to discard the Supreme Court's formulation in *Roe*" of a line between impermissible first-trimester regulation and permissible second-trimester regulation. 479 F. Supp., at 1215. The Court of Appeals affirmed on a similar basis. It accepted plaintiffs' argument that Akron's hospitalization requirement did not have a reasonable health justification during at least part of the second trimester, but declined to "retreat from the 'bright line' in *Roe* v. *Wade.*" 651 F. 2d, at

---

mester." *Roe*, 410 U. S., at 163. Unless otherwise indicated, all references in this opinion to gestational age are based on the time from the beginning of the last menstrual period.

[16] The Joint Commission on Accreditation of Hospitals (JCAH), for example, has established guidelines for the following services: dietetic, emergency, home care, nuclear medicine, pharmaceutical, professional library, rehabilitation, social work, and special care. See generally JCAH, Accreditation Manual for Hospitals, 1983 Edition (1982).

[17] Akron's ordinance distinguishes between "hospitals" and outpatient clinics. Section 1870.02 provides that even first-trimester abortions must be performed in "a hospital or an abortion facility." "Abortion facility" is defined as "a clinic, physician's office, or any other place or facility in which abortions are performed, other than a hospital." § 1870.01(G).

1210.[18]   We believe that the courts below misinterpreted this Court's prior decisions, and we now hold that § 1870.03 is unconstitutional.

A

In *Roe* v. *Wade* the Court held that after the end of the first trimester of pregnancy the State's interest becomes compelling, and it may "regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health." 410 U. S., at 163.   We noted, for example, that States could establish requirements relating "to the facility in which the procedure is to be performed, that is, whether it must be in a hospital or may be a clinic or some other place of less-than-hospital status." *Ibid.*   In the companion case of *Doe* v. *Bolton* the Court invalidated a Georgia requirement that all abortions be performed in a hospital licensed by the State Board of Health and accredited by the Joint Commission on Accreditation of Hospitals.   See 410 U. S., at 201.   We recognized the State's legitimate health interests in establishing, for second-trimester abortions, "standards for licensing all facilities where abortions may be performed." *Id.*, at 195.   We found, however, that "the State must show more than [was shown in *Doe*] in order to prove that only the full resources of

---

[18] The Court of Appeals believed that it was bound by *Gary-Northwest Indiana Women's Services, Inc.* v. *Bowen,* 496 F. Supp. 894 (ND Ind. 1980) (three-judge court), summarily aff'd *sub nom. Gary-Northwest Indiana Women's Services, Inc.* v. *Orr,* 451 U. S. 934 (1981), in which an Indiana second-trimester hospitalization requirement was upheld.   Although the District Court in that case found that *"Roe* does not render the constitutionality of second trimester regulations subject to either the availability of abortions or the improvements in medical techniques and skills," 496 F. Supp., at 901–902, it also rested the decision on the alternative ground that the plaintiffs had failed to provide evidence to support their theory that it was unreasonable to require hospitalization for dilatation and evacuation abortions performed early in the second trimester.   See *id.,* at 902–903.   Our summary affirmance therefore is not binding precedent on the hospitalization issue.   See *Illinois State Board of Elections* v. *Socialist Workers Party,* 440 U. S. 173, 180–181, 182–183 (1979).

a licensed hospital, rather than those of some other appropriately licensed institution, satisfy these health interests." *Ibid.*[19]

We reaffirm today, see *supra*, at 429, n. 11, that a State's interest in health regulation becomes compelling at approximately the end of the first trimester. The existence of a compelling state interest in health, however, is only the beginning of the inquiry. The State's regulation may be upheld only if it is reasonably designed to further that state interest. See *Doe*, 410 U. S., at 195. And the Court in *Roe* did not hold that it always is reasonable for a State to adopt an abortion regulation that applies to the entire second trimester. A State necessarily must have latitude in adopting regulations of general applicability in this sensitive area. But if it appears that during a substantial portion of the second trimester the State's regulation "depart[s] from accepted medical practice," *supra*, at 431, the regulation may not be upheld simply because it may be reasonable for the remaining portion of the trimester. Rather, the State is obligated to make a reasonable effort to limit the effect of its regulations to the period in the trimester during which its health interest will be furthered.

## B

There can be no doubt that § 1870.03's second-trimester hospitalization requirement places a significant obstacle in the path of women seeking an abortion. A primary burden created by the requirement is additional cost to the woman. The Court of Appeals noted that there was testimony that a second-trimester abortion costs more than twice as much in a

---

[19] We also found that the additional requirement that the licensed hospital be accredited by the JCAH was "not 'based on differences that are reasonably related to the purposes of the Act in which it is found.'" *Doe*, 410 U. S., at 194 (quoting *Morey* v. *Doud*, 354 U. S. 457, 465 (1957)). We concluded that, in any event, Georgia's hospital requirement was invalid because it applied to first-trimester abortions.

hospital as in a clinic. See 651 F. 2d, at 1209 (in-hospital abortion costs $850–$900, whereas a dilatation-and-evacuation (D&E) abortion performed in a clinic costs $350–$400).[20] Moreover, the court indicated that second-trimester abortions were rarely performed in Akron hospitals. *Ibid.* (only nine second-trimester abortions performed in Akron hospitals in the year before trial).[21] Thus, a second-trimester hospitalization requirement may force women to travel to find available facilities, resulting in both financial expense and additional health risk. It therefore is apparent that a second-trimester hospitalization requirement may significantly limit a woman's ability to obtain an abortion.

Akron does not contend that § 1870.03 imposes only an insignificant burden on women's access to abortion, but rather defends it as a reasonable health regulation. This position had strong support at the time of *Roe* v. *Wade,* as hospitalization for second-trimester abortions was recommended by the American Public Health Association (APHA), see *Roe,* 410 U. S., at 143–146, and the American College of Obstetricians and Gynecologists (ACOG), see Standards for Obstetric-Gynecologic Services 65 (4th ed. 1974). Since then, however, the safety of second-trimester abortions has increased

---

[20] National statistics indicate a similar cost difference. In 1978 the average clinic charged $284 for a D&E abortion, whereas the average hospital charge was $435. The hospital charge did not include the physician's fee, which ran as high as $300. See Rosoff, The Availability of Second-Trimester Abortion Services in the United States, published in Second-Trimester Abortion: Perspectives After a Decade of Experience 35 (G. Berger, W. Brenner, & L. Keith eds. 1981) (hereinafter Second-Trimester Abortion).

[21] The Akron situation is not unique. In many areas of this country, few, if any, hospitals perform second-trimester abortions. See, *e. g., Planned Parenthood Assn. of Kansas City, Mo., Inc.* v. *Ashcroft,* 664 F. 2d, at 689 (second-trimester D&E abortions available at only one hospital in Missouri); *Wolfe* v. *Stumbo,* 519 F. Supp. 22, 23 (WD Ky. 1980) (no elective post-first-trimester abortion performed in Kentucky hospitals); *Margaret S.* v. *Edwards,* 488 F. Supp. 181, 192 (ED La. 1980) (no hospitals in Louisiana perform abortions after first trimester).

dramatically.[22]   The principal reason is that the D&E procedure is now widely and successfully used for second-trimester abortions.[23]   The Court of Appeals found that there was "an abundance of evidence that D&E is the safest method of performing post-first trimester abortions today."   651 F. 2d, at 1209.   The availability of the D&E procedure during the interval between approximately 12 and 16 weeks of pregnancy, a period during which other second-trimester abortion techniques generally cannot be used,[24] has meant that women desiring an early second-trimester abortion no longer are forced to incur the health risks of waiting until at least the 16th week of pregnancy.

For our purposes, an even more significant factor is that experience indicates that D&E may be performed safely on an outpatient basis in appropriate nonhospital facilities.   The evidence is strong enough to have convinced the APHA to abandon its prior recommendation of hospitalization for all second-trimester abortions:

> "Current data show that abortions occurring in the second trimester can be safely performed by the Dilatation and Evacuation (D and E) procedure. . . . Requirements that all abortions after 12 weeks of gestation be performed in hospitals increase the expense and inconvenience to the woman without contributing to the safety of the procedure."   APHA Recommended Pro-

---

[22] The death-to-case ratio for all second-trimester abortions in this country fell from 14.4 deaths per 100,000 abortions in 1972 to 7.6 per 100,000 in 1977.   See Tyler, Cates, Schulz, Selik, & Smith, Second-Trimester Induced Abortion in the United States, published in Second-Trimester Abortion 17–20.

[23] At the time *Roe* was decided, the D&E procedure was used only to perform first-trimester abortions.

[24] Installation procedures, the primary means of performing a second-trimester abortion before the development of D&E, generally cannot be performed until approximately the 16th week of pregnancy because until that time the amniotic sac is too small.   See Grimes & Cates, Dilatation and Evacuation, published in Second-Trimester Abortion 121.

gram Guide for Abortion Services (Revised 1979), 70 Am. J. Public Health 652, 654 (1980) (hereinafter APHA Recommended Guide).

Similarly, the ACOG no longer suggests that all second-trimester abortions be performed in a hospital. It recommends that abortions performed in a physician's office or outpatient clinic be limited to 14 weeks of pregnancy, but it indicates that abortions may be performed safely in "a hospital-based or in a free-standing ambulatory surgical facility, or in an outpatient clinic meeting the criteria required for a free-standing surgical facility," until 18 weeks of pregnancy. ACOG, Standards for Obstetric-Gynecologic Services 54 (5th ed. 1982).

These developments, and the professional commentary supporting them, constitute impressive evidence that—at least during the early weeks of the second trimester—D&E abortions may be performed as safely in an outpatient clinic as in a full-service hospital.[25] We conclude, therefore, that "present medical knowledge," *Roe, supra,* at 163, convincingly undercuts Akron's justification for requiring that *all* second-trimester abortions be performed in a hospital.[26]

---

[25] See also *Planned Parenthood Assn. of Kansas City, Mo., Inc.* v. *Ashcroft, supra,* at 690, n. 6 (discussing testimony by Dr. Willard Cates, Chief of Federal Abortion Surveillance for the National Centers for Disease Control, that D&E second-trimester abortions are as safely performed outside of hospitals up to the 16th week); APHA Recommended Guide 654 (outpatient D&E is safer than all in-hospital non-D&E abortion procedures during the second trimester).

[26] At trial Akron relied largely on the former position of the various medical organizations concerning hospitalization during the second trimester. See 651 F. 2d, at 1209. The revised position of the ACOG did not occur until after trial.

Akron also argues that the safety of nonhospital D&E abortions depends on adherence to minimum standards such as those adopted by ACOG for free-standing surgical facilities, see ACOG Standards 51–62, and that there is no evidence that plaintiffs' clinics operate in this manner. But the issue in this litigation is not whether these clinics would meet such stand-

Akron nonetheless urges that "[t]he fact that some mid-trimester abortions may be done in a minimally equipped clinic does not invalidate the regulation."[27]   Brief for Respondents in No. 81–1172, p. 19.   It is true that a state abortion regulation is not unconstitutional simply because it does not correspond perfectly in all cases to the asserted state interest. But the lines drawn in a state regulation must be reasonable, and this cannot be said of § 1870.03.   By preventing the performance of D&E abortions in an appropriate nonhospital setting, Akron has imposed a heavy, and unnecessary, burden on women's access to a relatively inexpensive, otherwise accessible, and safe abortion procedure.[28]   Section 1870.03 has "the effect of inhibiting . . . the vast majority of abortions after the first 12 weeks," *Danforth*, 428 U. S., at 79, and

---

ards if they were prescribed by the city.   Rather, Akron has gone much further by banning all second-trimester abortions in all clinics, a regulation that does not reasonably further the city's interest in promoting health. We continue to hold, as we did in *Doe* v. *Bolton*, that a State may, "from and after the end of the first trimester, adopt standards for licensing all facilities where abortions may be performed so long as those standards are legitimately related to the objective the State seeks to accomplish."   410 U. S., at 194–195.   This includes standards designed to correct any deficiencies that Akron reasonably believes exist in the clinics' present operation.

[27] The city thus implies that its hospital requirement may be sustained because it is reasonable as applied to later D&E abortions or to all second-trimester instillation abortions.   We do not hold today that a State in no circumstances may require that some abortions be performed in a full-service hospital.   Abortions performed by D&E are much safer, up to a point in the development of the fetus, than those performed by instillation methods.   See Cates & Grimes, *Morbidity and Mortality*, published in Second-Trimester Abortion 166–169.   The evidence before us as to the need for hospitalization concerns only the D&E method performed in the early weeks of the second trimester.   See 651 F. 2d, at 1208–1210.

[28] In the United States during 1978, 82.1% of all abortions from 13–15 weeks and 24.6% of all abortions from 16–20 weeks were performed by the D&E method.   See Department of Health and Human Services, Centers for Disease Control, Abortion Surveillance: Annual Summary 1978, Table 14, p. 43 (1980).

therefore unreasonably infringes upon a woman's constitutional right to obtain an abortion.

## IV

We turn next to § 1870.05(B), the provision prohibiting a physician from performing an abortion on a minor pregnant woman under the age of 15 unless he obtains "the informed written consent of one of her parents or her legal guardian" or unless the minor obtains "an order from a court having jurisdiction over her that the abortion be performed or induced." The District Court invalidated this provision because "[i]t does not establish a procedure by which a minor can avoid a parental veto of her abortion decision by demonstrating that her decision is, in fact, informed. Rather, it requires, in all cases, both the minor's informed consent and either parental consent or a court order." 479 F. Supp., at 1201. The Court of Appeals affirmed on the same basis.[29]

The relevant legal standards are not in dispute. The Court has held that "the State may not impose a blanket provision . . . requiring the consent of a parent or person *in loco parentis* as a condition for abortion of an unmarried minor." *Danforth, supra,* at 74. In *Bellotti* v. *Baird,* 443 U. S. 622 (1979) *(Bellotti II),* a majority of the Court indicated that a State's interest in protecting immature minors will sustain a requirement of a consent substitute, either parental or judicial. See *id.,* at 640–642 (plurality opinion for four Justices); *id.,* at 656–657 (WHITE, J., dissenting) (expressing approval of absolute parental or judicial consent requirement). See also *Danforth, supra,* at 102–105 (STEVENS, J., concurring in part and dissenting in part). The *Bellotti II* plurality cautioned, however, that the State must provide an alternative procedure whereby a pregnant minor may demonstrate that she is sufficiently mature to make the abortion decision her-

---

[29] The Court of Appeals upheld § 1870.05(A)'s notification requirement. See 651 F. 2d, at 1206. The validity of this ruling has not been challenged in this Court.

self or that, despite her immaturity, an abortion would be in her best interests. 443 U. S., at 643–644. Under these decisions, it is clear that Akron may not make a blanket determination that *all* minors under the age of 15 are too immature to make this decision or that an abortion never may be in the minor's best interests without parental approval.

Akron's ordinance does not create expressly the alternative procedure required by *Bellotti II*. But Akron contends that the Ohio Juvenile Court will qualify as a "court having jurisdiction" within the meaning of § 1870.05(B), and that "it is not to be assumed that during the course of the juvenile proceedings the Court will not construe the ordinance in a manner consistent with the constitutional requirement of a determination of the minor's ability to make an informed consent." Brief for Petitioner in No. 81–746, p. 28. Akron concludes that the courts below should not have invalidated § 1870.05(B) on its face. The city relies on *Bellotti* v. *Baird*, 428 U. S. 132 (1976) *(Bellotti I)*, in which the Court did not decide whether a State's parental consent provisions were unconstitutional as applied to mature minors, holding instead that "abstention is appropriate where an unconstrued state statute is susceptible of a construction by the state judiciary 'which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.'" *Id.*, at 146–147 (quoting *Harrison* v. *NAACP*, 360 U. S. 167, 177 (1959)). See also *H. L.* v. *Matheson*, 450 U. S. 398 (1981) (refusing to decide whether parental notice statute would be constitutional as applied to mature minors).[30]

---

[30] The Court's primary holding in *Matheson* was that the pregnant minor who questioned Utah's abortion consent requirement on the ground that it impermissibly applied to mature or emancipated minors lacked standing to raise that argument since she had not alleged that she or any member of her class was mature or emancipated. 450 U. S., at 406. No such standing problem exists here, however, as the physician plaintiff, who is subject to potential criminal liability for failure to comply with the requirements of § 1870.05(B), has standing to raise the claims of his minor patients. See

We do not think that the abstention principle should have been applied here. It is reasonable to assume, as we did in *Bellotti I, supra*, and *Matheson, supra*, that a state court presented with a state statute specifically governing abortion consent procedures for pregnant minors will attempt to construe the statute consistently with constitutional requirements. This suit, however, concerns a municipal ordinance that creates no procedures for making the necessary determinations. Akron seeks to invoke the Ohio statute governing juvenile proceedings, but that statute neither mentions minors' abortions nor suggests that the Ohio Juvenile Court has authority to inquire into a minor's maturity or emancipation.[31] In these circumstances, we do not think that the Akron ordinance, as applied in Ohio juvenile proceedings, is reasonably susceptible of being construed to create an "opportunity for case-by-case evaluations of the maturity of pregnant minors." *Bellotti II, supra*, at 643, n. 23 (plurality

---

*Danforth*, 428 U. S., at 62; *Doe* v. *Bolton*, 410 U. S., at 188–189; *Bellotti II*, 443 U. S., at 627, n. 5 (plurality opinion).

[31] The Ohio Juvenile Court has jurisdiction over any child "alleged to be a juvenile traffic offender, delinquent, unruly, abused, neglected, or dependent." Ohio Rev. Code Ann. § 2151.23 (Supp. 1982). The only category that arguably could encompass a pregnant minor desiring an abortion would be the "neglected" child category. A neglected child is defined as one "[w]hose parents, guardian or custodian neglects or refuses to provide him with proper or necessary subsistence, education, medical or surgical care, or other care necessary for his health, morals, or well being." § 2151.03. Even assuming that the Ohio courts would construe these provisions as permitting a minor to obtain judicial approval for the "proper or necessary . . . medical or surgical care" of an abortion, where her parents had refused to provide that care, the statute makes no provision for a mature or emancipated minor completely to avoid hostile parental involvement by demonstrating to the satisfaction of the court that she is capable of exercising her constitutional right to choose an abortion. On the contrary, the statute requires that the minor's parents be notified once a petition has been filed, § 2151.28, a requirement that in the case of a mature minor seeking an abortion would be unconstitutional. See *H. L.* v. *Matheson*, 450 U. S., at 420 (POWELL, J., concurring); *id.*, at 428, n. 3 (MARSHALL, J., dissenting).

opinion). We therefore affirm the Court of Appeals' judgment that § 1870.05(B) is unconstitutional.

V

The Akron ordinance provides that no abortion shall be performed except "with the informed written consent of the pregnant woman, . . . given freely and without coercion." § 1870.06(A). Furthermore, "in order to insure that the consent for an abortion is truly informed consent," the woman must be "orally informed by her attending physician" of the status of her pregnancy, the development of her fetus, the date of possible viability, the physical and emotional complications that may result from an abortion, and the availability of agencies to provide her with assistance and information with respect to birth control, adoption, and childbirth. § 1870.06(B). In addition, the attending physician must inform her "of the particular risks associated with her own pregnancy and the abortion technique to be employed . . . [and] other information which in his own medical judgment is relevant to her decision as to whether to have an abortion or carry her pregnancy to term." § 1870.06(C).

The District Court found that § 1870.06(B) was unconstitutional, but that § 1870.06(C) was related to a valid state interest in maternal health. See 479 F. Supp., at 1203–1204. The Court of Appeals concluded that both provisions were unconstitutional. See 651 F. 2d, at 1207. We affirm.

A

In *Danforth*, we upheld a Missouri law requiring a pregnant woman to "certif[y] in writing her consent to the abortion and that her consent is informed and freely given and is not the result of coercion." 428 U. S., at 85. We explained:

"The decision to abort . . . is an important, and often a stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and conse-

quences. The woman is the one primarily concerned, and her awareness of the decision and its significance may be assured, constitutionally, by the State to the extent of requiring her prior written consent." *Id.*, at 67.

We rejected the view that "informed consent" was too vague a term, construing it to mean "the giving of information to the patient as to just what would be done and as to its consequences. To ascribe more meaning than this might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession." *Id.*, at 67, n. 8.

The validity of an informed consent requirement thus rests on the State's interest in protecting the health of the pregnant woman. The decision to have an abortion has "implications far broader than those associated with most other kinds of medical treatment," *Bellotti II*, 443 U. S., at 649 (plurality opinion), and thus the State legitimately may seek to ensure that it has been made "in the light of all attendant circumstances—psychological and emotional as well as physical—that might be relevant to the well-being of the patient." *Colautti* v. *Franklin*, 439 U. S., at 394.[32] This does not mean, however, that a State has unreviewable authority to decide what information a woman must be given before she chooses to have an abortion. It remains primarily the responsibility of the physician to ensure that appropriate information is conveyed to his patient, depending on her particular circumstances. *Danforth*'s recognition of the State's interest in ensuring that this information be given

---

[32] In particular, we have emphasized that a State's interest in protecting immature minors and in promoting family integrity gives it a special interest in ensuring that the abortion decision is made with understanding and after careful deliberation. See, *e. g.*, *H. L.* v. *Matheson*, 450 U. S., at 411; *id.*, at 419–420 (POWELL, J., concurring); *id.*, at 421–424 (STEVENS, J., concurring in judgment).

will not justify abortion regulations designed to influence the woman's informed choice between abortion or childbirth.[33]

## B

Viewing the city's regulations in this light, we believe that § 1870.06(B) attempts to extend the State's interest in ensuring "informed consent" beyond permissible limits. First, it is fair to say that much of the information required is designed not to inform the woman's consent but rather to persuade her to withhold it altogether. Subsection (3) requires the physician to inform his patient that "the unborn child is a human life from the moment of conception," a requirement inconsistent with the Court's holding in *Roe* v. *Wade* that a State may not adopt one theory of when life begins to justify its regulation of abortions. See 410 U. S., at 159–162. Moreover, much of the detailed description of "the anatomical and physiological characteristics of the particular unborn child" required by subsection (3) would involve at best speculation by the physician.[34] And subsection (5), that begins with the dubious statement that "abortion is a major surgical procedure"[35] and proceeds to describe numerous possible

---

[33] A State is not always foreclosed from asserting an interest in whether pregnancies end in abortion or childbirth. In *Maher* v. *Roe*, 432 U. S. 464 (1977), and *Harris* v. *McRae*, 448 U. S. 297 (1980), we upheld governmental spending statutes that reimbursed indigent women for childbirth but not abortion. This legislation to further an interest in preferring childbirth over abortion was permissible, however, only because it did not add any "restriction on access to abortions that was not already there." *Maher, supra*, at 474.

[34] This description must include, but not be limited to, "appearance, mobility, tactile sensitivity, including pain, perception or response, brain and heart function, the presence of internal organs and the presence of external members." The District Court found that "there was much evidence that it is impossible to determine many of [these] items, . . . such as the 'unborn child's' sensitivity to pain." 479 F. Supp., at 1203.

[35] The District Court found that "there was much evidence that rather than being 'a major surgical procedure' as the physician is required to state . . . , an abortion generally is considered a 'minor surgical procedure.'" *Ibid.*

physical and psychological complications of abortion,[36] is a "parade of horribles" intended to suggest that abortion is a particularly dangerous procedure.

An additional, and equally decisive, objection to § 1870.06(B) is its intrusion upon the discretion of the pregnant woman's physician. This provision specifies a litany of information that the physician must recite to each woman regardless of whether in his judgment the information is relevant to her personal decision. For example, even if the physician believes that some of the risks outlined in subsection (5) are nonexistent for a particular patient, he remains obligated to describe them to her. In *Danforth* the Court warned against placing the physician in just such an "undesired and uncomfortable straitjacket." 428 U. S., at 67, n. 8. Consistent with its interest in ensuring informed consent, a State may require that a physician make certain that his patient understands the physical and emotional implications of having an abortion. But Akron has gone far beyond merely describing the general subject matter relevant to informed consent. By insisting upon recitation of a lengthy and inflexible list of information, Akron unreasonably has placed "obstacles in the path of the doctor upon whom [the woman is] entitled to rely for advice in connection with her decision." *Whalen* v. *Roe*, 429 U. S., at 604, n. 33.[37]

---

[36] Section 1870.06(B)(5) requires the physician to state "[t]hat abortion is a major surgical procedure which can result in serious complications, including hemorrhage, perforated uterus, infection, menstrual disturbances, sterility and miscarriage and prematurity in subsequent pregnancies; and that abortion may leave essentially unaffected or may worsen any existing psychological problems she may have, and can result in severe emotional disturbances."

[37] Akron has made little effort to defend the constitutionality of §§ 1870.06(B)(3), (4), and (5), but argues that the remaining four subsections of the provision are valid and severable. These four subsections require that the patient be informed by the attending physician of the fact that she is pregnant, § 1870.06(B)(1), the gestational age of the fetus, § 1870.06(B)(2), the av :ilability of information on birth control and adop-

## C

Section 1870.06(C) presents a different question. Under this provision, the "attending physician" must inform the woman

> "of the particular risks associated with her own pregnancy and the abortion technique to be employed including providing her with at least a general description of the medical instructions to be followed subsequent to the abortion in order to insure her safe recovery, and shall in addition provide her with such other information which in his own medical judgment is relevant to her decision as to whether to have an abortion or carry her pregnancy to term."

The information required clearly is related to maternal health and to the State's legitimate purpose in requiring informed consent. Nonetheless, the Court of Appeals determined that it interfered with the physician's medical judgment "in exactly the same way as section 1870.06(B). It requires the doctor to make certain disclosures in all cases, regardless of his own professional judgment as to the desirability of doing so." 651 F. 2d, at 1207. This was a misapplication of *Danforth*. There we construed "informed consent" to mean "the giving of information to the patient as to just what would be done and as to its consequences." 428 U. S., at 67, n. 8. We see no significant difference in Akron's requirement that the woman be told of the particular risks of her pregnancy and the abortion technique to be

tion, § 1870.06(B)(6), and the availability of assistance during pregnancy and after childbirth, § 1870.06(B)(7). This information, to the extent it is accurate, certainly is not objectionable, and probably is routinely made available to the patient. We are not persuaded, however, to sever these provisions from the remainder of § 1870.06(B). They require that all of the information be given orally by the attending physician when much, if not all of it, could be given by a qualified person assisting the physician. See *infra*, at 448–449.

used, and be given general instructions on proper postabortion care. Moreover, in contrast to subsection (B), § 1870.06(C) merely describes in general terms the information to be disclosed. It properly leaves the precise nature and amount of this disclosure to the physician's discretion and "medical judgment."

The Court of Appeals also held, however, that § 1870.06(C) was invalid because it required that the disclosure be made by the "attending physician." The court found that "the practice of all three plaintiff clinics has been for the counseling to be conducted by persons other than the doctor who performs the abortion," 651 F. 2d, at 1207, and determined that Akron had not justified requiring the physician personally to describe the health risks. Akron challenges this holding as contrary to our cases that emphasize the importance of the physician-patient relationship. In Akron's view, as in the view of the dissenting judge below, the "attending physician" requirement "does no more than seek to ensure that there is in fact a true physician-patient relationship even for the woman who goes to an abortion clinic." *Id.*, at 1217 (Kennedy, J., concurring in part and dissenting in part).

Requiring physicians personally to discuss the abortion decision, its health risks, and consequences with each patient may in some cases add to the cost of providing abortions, though the record here does not suggest that ethical physicians will charge more for adhering to this typical element of the physician-patient relationship. Yet in *Roe* and subsequent cases we have "stressed repeatedly the central role of the physician, both in consulting with the woman about whether or not to have an abortion, and in determining how any abortion was to be carried out." *Colautti* v. *Franklin,* 439 U. S., at 387. Moreover, we have left no doubt that, to ensure the safety of the abortion procedure, the States may mandate that only physicians perform abortions. See *Connecticut* v. *Menillo,* 423 U. S. 9, 11 (1975); *Roe,* 410 U. S., at 165.

We are not convinced, however, that there is as vital a state need for insisting that the physician performing the abortion, or for that matter any physician, personally counsel the patient in the absence of a request. The State's interest is in ensuring that the woman's consent is informed and unpressured; the critical factor is whether she obtains the necessary information and counseling from a qualified person, not the identity of the person from whom she obtains it.[38] Akron and intervenors strongly urge that the nonphysician counselors at the plaintiff abortion clinics are not trained or qualified to perform this important function. The courts below made no such findings, however, and on the record before us we cannot say that the woman's consent to the abortion will not be informed if a physician delegates the counseling task to another qualified individual.

In so holding, we do not suggest that the State is powerless to vindicate its interest in making certain the "important" and "stressful" decision to abort "[i]s made with full knowledge of its nature and consequences." *Danforth*, 428 U. S., at 67. Nor do we imply that a physician may abdicate his essential role as the person ultimately responsible for the medical aspects of the decision to perform the abortion.[39] A

---

[38] We do not suggest that appropriate counseling consists simply of a recital of pertinent medical facts. On the contrary, it is clear that the needs of patients for information and an opportunity to discuss the abortion decision will vary considerably. It is not disputed that individual counseling should be available for those persons who desire or need it. See, *e. g.*, National Abortion Federation Standards 1 (1981) (hereinafter NAF Standards); Planned Parenthood of Metropolitan Washington, D. C., Inc., Guidelines for Operation, Maintenance, and Evaluation of First Trimester Outpatient Abortion Facilities 5 (1980). Such an opportunity may be especially important for minors alienated or separated from their parents. See APHA Recommended Guide 654. Thus, for most patients, mere provision of a printed statement of relevant information is not counseling.

[39] This Court's consistent recognition of the critical role of the physician in the abortion procedure has been based on the model of the competent, conscientious, and ethical physician. See *Doe*, 410 U. S., at 196–197. We have no occasion in this case to consider conduct by physicians that may

State may define the physician's responsibility to include verification that adequate counseling has been provided and that the woman's consent is informed.[40] In addition, the State may establish reasonable minimum qualifications for those people who perform the primary counseling function.[41] See, *e. g.*, *Doe*, 410 U. S., at 195 (State may require a medical facility "to possess all the staffing and services necessary to perform an abortion safely"). In light of these alternatives, we believe that it is unreasonable for a State to insist that only a physician is competent to provide the information and counseling relevant to informed consent. We affirm the judgment of the Court of Appeals that § 1870.06(C) is invalid.

## VI

The Akron ordinance prohibits a physician from performing an abortion until 24 hours after the pregnant woman signs a consent form. § 1870.07.[42] The District Court upheld this provision on the ground that it furthered Akron's interest in ensuring "that a woman's abortion decision is made after careful consideration of all the facts applicable to her particu-

---

depart from this model. Cf. *Danforth*, 428 U. S., at 91–92, n. 2 (Stewart, J., concurring).

[40] Cf. ACOG Standards 54 ("If counseling has been provided elsewhere, the physician performing the abortion should verify that the counseling has taken place").

[41] The importance of well-trained and competent counselors is not in dispute. See, *e. g.*, APHA Recommended Guide 654 ("Abortion counselors may be highly skilled physicians as well as trained, sympathetic individuals working under appropriate supervision"); NAF Standards 2 (counselors must be trained initially at least in the following subjects: "sexual and reproductive health; abortion technology; contraceptive technology; short-term counseling skills; community resources and referrals; informed consent; agency policies and practices").

[42] This provision does not apply if the physician certifies in writing that "there is an emergency need for an abortion to be performed or induced such that continuation of the pregnancy poses an immediate threat and grave risk to the life or physical health of the pregnant woman." § 1870.12.

lar situation." 479 F. Supp., at 1204. The Court of Appeals reversed, finding that the inflexible waiting period had "no medical basis," and that careful consideration of the abortion decision by the woman "is beyond the state's power to require." 651 F. 2d, at 1208. We affirm the Court of Appeals' judgment.

The District Court found that the mandatory 24-hour waiting period increases the cost of obtaining an abortion by requiring the woman to make two separate trips to the abortion facility. See 479 F. Supp., at 1204. Plaintiffs also contend that because of scheduling difficulties the effective delay may be longer than 24 hours, and that such a delay in some cases could increase the risk of an abortion. Akron denies that any significant health risk is created by a 24-hour waiting period, and argues that a brief period of delay—with the opportunity for reflection on the counseling received—often will be beneficial to the pregnant woman.

We find that Akron has failed to demonstrate that any legitimate state interest is furthered by an arbitrary and inflexible waiting period. There is no evidence suggesting that the abortion procedure will be performed more safely. Nor are we convinced that the State's legitimate concern that the woman's decision be informed is reasonably served by requiring a 24-hour delay as a matter of course. The decision whether to proceed with an abortion is one as to which it is important to "affor[d] the physician adequate discretion in the exercise of his medical judgment." *Colautti* v. *Franklin*, 439 U. S., at 387. In accordance with the ethical standards of the profession, a physician will advise the patient to defer the abortion when he thinks this will be beneficial to her.[43] But if a woman, after appropriate counseling, is pre-

---

[43] The ACOG recommends that a clinic allow "sufficient time for reflection prior to making an informed decision." ACOG Standards 54. In contrast to § 1870.07's mandatory waiting period, this standard recognizes that the time needed for consideration of the decision varies depending on

pared to give her written informed consent and proceed with the abortion, a State may not demand that she delay the effectuation of that decision.

## VII

Section § 1870.16 of the Akron ordinance requires physicians performing abortions to "insure that the remains of the unborn child are disposed of in a humane and sanitary manner." The Court of Appeals found that the word "humane" was impermissibly vague as a definition of conduct subject to criminal prosecution. The court invalidated the entire provision, declining to sever the word "humane" in order to uphold the requirement that disposal be "sanitary." See 651 F. 2d, at 1211. We affirm this judgment.

Akron contends that the purpose of § 1870.16 is simply " 'to preclude the mindless dumping of aborted fetuses onto garbage piles.' " *Planned Parenthood Assn.* v. *Fitzpatrick*, 401 F. Supp. 554, 573 (ED Pa. 1975) (three-judge court) (quoting State's characterization of legislative purpose), summarily aff'd *sub nom. Franklin* v. *Fitzpatrick*, 428 U. S. 901 (1976).[44] It is far from clear, however, that this provision has such a limited intent. The phrase "humane and sanitary" does, as the Court of Appeals noted, suggest a possible intent to "mandate some sort of 'decent burial' of an embryo at the earliest stages of formation." 651 F. 2d, at 1211. This level of uncertainty is fatal where criminal liability is imposed. See *Colautti* v. *Franklin, supra,* at 396. Because § 1870.16 fails to give a physician "fair notice that his contemplated conduct is forbidden," *United States* v. *Harriss,* 347

---

the particular situation of the patient and how much prior counseling she has received.

[44] In *Fitzpatrick* the District Court accepted Pennsylvania's contention that its statute governing the "humane" disposal of fetal remains was designed only to prevent such "mindless dumping." That decision is distinguishable because the statute did not impose criminal liability, but merely provided for the promulgation of regulations to implement the disposal requirement. See 401 F. Supp., at 572–573.

U. S. 612, 617 (1954), we agree that it violates the Due Process Clause.[45]

## VIII

We affirm the judgment of the Court of Appeals invalidating those sections of Akron's "Regulations of Abortions" ordinance that deal with parental consent, informed consent, a 24-hour waiting period, and the disposal of fetal remains. The remaining portion of the judgment, sustaining Akron's requirement that all second-trimester abortions be performed in a hospital, is reversed.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE WHITE and JUSTICE REHNQUIST join, dissenting.

In *Roe* v. *Wade*, 410 U. S. 113 (1973), the Court held that the "right of privacy . . . founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.*, at 153. The parties in these cases have not asked the Court to re-examine the validity of that holding and the court below did not address it. Accordingly, the Court does not re-examine its previous holding. Nonetheless, it is apparent from the Court's opinion that neither sound constitutional theory nor our need to decide cases based on the application of neutral principles can accommodate an analytical framework that varies according to the "stages" of pregnancy, where those stages, and their concomitant standards of review, differ according to the level of medical technology available when a particular challenge to state regulation occurs. The Court's analysis of the Akron regulations is inconsistent both with

---

[45] We are not persuaded by Akron's argument that the word "humane" should be severed from the statute. The uncertain meaning of the phrase "humane and sanitary" leaves doubt as to whether the city would have enacted § 1870.16 with the word "sanitary" alone. Akron remains free, of course, to enact more carefully drawn regulations that further its legitimate interest in proper disposal of fetal remains.

the methods of analysis employed in previous cases dealing with abortion, and with the Court's approach to fundamental rights in other areas.

Our recent cases indicate that a regulation imposed on "a lawful abortion 'is not unconstitutional unless it unduly burdens the right to seek an abortion.'" *Maher* v. *Roe*, 432 U. S. 464, 473 (1977) (quoting *Bellotti* v. *Baird*, 428 U. S. 132, 147 (1977) *(Bellotti I)*). See also *Harris* v. *McRae*, 448 U. S. 297, 314 (1980). In my view, this "unduly burdensome" standard should be applied to the challenged regulations throughout the entire pregnancy without reference to the particular "stage" of pregnancy involved. If the particular regulation does not "unduly burde[n]" the fundamental right, *Maher*, *supra*, at 473, then our evaluation of that regulation is limited to our determination that the regulation rationally relates to a legitimate state purpose. Irrespective of what we may believe is wise or prudent policy in this difficult area, "the Constitution does not constitute us as 'Platonic Guardians' nor does it vest in this Court the authority to strike down laws because they do not meet our standards of desirable social policy, 'wisdom,' or 'common sense.'" *Plyler* v. *Doe*, 457 U. S. 202, 242 (1982) (BURGER, C. J., dissenting).

I

The trimester or "three-stage" approach adopted by the Court in *Roe*,[1] and, in a modified form, employed by the

---

[1] *Roe* recognized that the State possesses important and legitimate interests in protecting maternal health and the potentiality of human life. These "separate and distinct" interests were held to grow "in substantiality as the woman approaches term and, at a point during pregnancy, each becomes 'compelling.'" 410 U. S., at 162–163. The state interest in maternal health was said to become compelling "at approximately the end of the first trimester." *Id.*, at 163. Before that time, "the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician." *Id.*, at 164. After the end of the first trimester, "a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health." *Id.*, at 163. The Court noted that "in the light of present

Court to analyze the regulations in these cases, cannot be supported as a legitimate or useful framework for accommodating the woman's right and the State's interests. The decision of the Court today graphically illustrates why the trimester approach is a completely unworkable method of accommodating the conflicting personal rights and compelling state interests that are involved in the abortion context.

As the Court indicates today, the State's compelling interest in maternal health changes as medical technology changes, and any health regulation must not "depart from accepted medical practice." *Ante*, at 431.[2] In applying this standard, the Court holds that "the safety of second-trimester abortions has increased dramatically" since 1973, when

medical knowledge . . . mortality in abortion may be less than mortality in normal childbirth" during the first trimester of pregnancy. *Ibid.*

The state interest in potential human life was held to become compelling at "viability," defined by the Court as that point "at which the fetus . . . [is] potentially able to live outside the mother's womb, albeit with artificial aid." *Roe*, 410 U. S., at 160 (footnote omitted). Based on the Court's review of the contemporary medical literature, it placed viability at about 28 weeks, but acknowledged that this point may occur as early as 24 weeks. After viability is reached, the State may, according to *Roe*, proscribe abortion altogether, except when it is necessary to preserve the life and health of the mother. See *id.*, at 163–164. Since *Roe*, the Court has held that *Roe* "left the point [of viability] flexible for anticipated advancements in medical skill." *Colautti* v. *Franklin*, 439 U. S. 379, 387 (1979).

The Court has also identified a state interest in protection of the young and "familial integrity" in the abortion context. See, *e. g.*, *H. L.* v. *Matheson*, 450 U. S. 398, 411 (1981).

[2] Although the Court purports to retain the trimester approach as "a reasonable legal framework for limiting" state regulatory authority over abortions, *ante* at 429, n. 11, the Court expressly abandons the *Roe* view that the relative rates of childbirth and abortion mortality are relevant for determining whether second-trimester regulations are reasonably related to maternal health. Instead, the Court decides that a health regulation must not "depart from accepted medical practice" if it is to be upheld. *Ante*, at 431. The State must now "make a reasonable effort to limit the effect of its regulations *to the period in the trimester* during which its health interest will be furthered." *Ante*, at 434 (emphasis added).

*Roe* was decided. *Ante,* at 435–436 (footnote omitted). Although a regulation such as one requiring that all second-trimester abortions be performed in hospitals "had strong support" in 1973 "as a reasonable health regulation," *ante,* at 435, this regulation can no longer stand because, according to the Court's diligent research into medical and scientific literature, the dilation and evacuation (D&E) procedure, used in 1973 only for first-trimester abortions, "is now widely and successfully used for second-trimester abortions." *Ante,* at 436 (footnote omitted). Further, the medical literature relied on by the Court indicates that the D&E procedure may be performed in an appropriate nonhospital setting for "at least . . . the early weeks of the second trimester . . . ." *Ante,* at 437. The Court then chooses the period of 16 weeks of gestation as that point at which D&E procedures may be performed safely in a nonhospital setting, and thereby invalidates the Akron hospitalization regulation.

It is not difficult to see that despite the Court's purported adherence to the trimester approach adopted in *Roe,* the lines drawn in that decision have now been "blurred" because of what the Court accepts as technological advancement in the safety of abortion procedure. The State may no longer rely on a "bright line" that separates permissible from impermissible regulation, and it is no longer free to consider the second trimester as a unit and weigh the risks posed by all abortion procedures throughout that trimester.[3] Rather,

---

[3] The Court holds that the summary affirmance in *Gary-Northwest Indiana Women's Services, Inc. v. Bowen,* 496 F. Supp. 894 (ND Ind. 1980) (three-judge court), aff'd *sub nom. Gary-Northwest Indiana Women's Services, Inc. v. Orr,* 451 U. S. 934 (1981), is not, as the court below thought, binding precedent on the hospitalization issue. See *ante,* at 433, n. 18. Although the Court reads *Gary-Northwest* to be decided on the alternative ground that the plaintiffs failed to prove the safety of second-trimester abortions, *ante,* at 433, n. 18, the Court simply ignores the fact that the District Court in *Gary-Northwest* held that "*even if* the plaintiffs could prove birth more dangerous than early second trimester D&E abor-

the State must continuously and conscientiously study contemporary medical and scientific literature in order to determine whether the effect of a particular regulation is to "depart from accepted medical practice" insofar as particular procedures and particular periods within the trimester are concerned. Assuming that legislative bodies are able to engage in this exacting task,[4] it is difficult to believe that our Constitution *requires* that they do it as a prelude to protecting the health of their citizens. It is even more difficult to believe that this Court, without the resources available to those bodies entrusted with making legislative choices, believes itself competent to make these inquiries and to revise these standards every time the American College of Obstetricians and Gynecologists (ACOG) or similar group revises its views about what is and what is not appropriate medical procedure in this area. Indeed, the ACOG Standards on which the Court relies were changed in 1982 after trial in the present cases. Before ACOG changed its Standards in 1982, it recommended that all mid-trimester abortions be performed in a hospital. See 651 F. 2d 1198, 1209 (CA6 1981). As today's decision indicates, medical technology is changing, and this change will necessitate our continued functioning as the Nation's *"ex officio* medical board with powers to approve or disapprove medical and operative practices and standards throughout the United States." *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52, 99 (1976) (WHITE, J., concurring in part and dissenting in part).

Just as improvements in medical technology inevitably will move *forward* the point at which the State may regulate for reasons of maternal health, different technological improvements will move *backward* the point of viability at which the

---

tions," that would *not* matter insofar as the constitutionality of the regulations were concerned. See 496 F. Supp., at 903 (emphasis added).

[4] Irrespective of the difficulty of the task, legislatures, with their superior factfinding capabilities, are certainly better able to make the necessary judgments than are courts.

State may proscribe abortions except when necessary to preserve the life and health of the mother.

In 1973, viability before 28 weeks was considered unusual. The 14th edition of L. Hellman & J. Pritchard, Williams Obstetrics (1971), on which the Court relied in *Roe* for its understanding of viability, stated, at 493, that "[a]ttainment of a [fetal] weight of 1,000 g [or a fetal age of approximately 28 weeks' gestation] is . . . widely used as the criterion of viability." However, recent studies have demonstrated increasingly earlier fetal viability.[5] It is certainly reasonable to believe that fetal viability in the first trimester of pregnancy may be possible in the not too distant future. Indeed, the Court has explicitly acknowledged that *Roe* left the point of viability "flexible for anticipated advancements in medical skill." *Colautti* v. *Franklin*, 439 U. S. 379, 387 (1979). "[W]e recognized in *Roe* that viability was a matter of medi-

---

[5] One study shows that infants born alive with a gestational age of less than 25 weeks and weight between 500 and 1,249 grams have a 20% chance of survival. See Phillip, Little, Polivy, & Lucey, Neonatal Mortality Risk for the Eighties: The Importance of Birth Weight/Gestational Age Groups, 68 Pediatrics 122 (1981). Another recent comparative study shows that preterm infants with a weight of 1,000 grams or less born in one hospital had a 42% rate of survival. Kopelman, The Smallest Preterm Infants: Reasons for Optimism and New Dilemmas, 132 Am. J. Diseases of Children 461 (1978). An infant weighing 484 grams and having a gestational age of 22 weeks at birth is now thriving in a Los Angeles hospital, and the attending physician has stated that the infant has a "95% chance of survival." Washington Post, Mar. 31, 1983, p. A2, col. 2. The aborted fetus in *Simopoulos* v. *Virginia, post*, p. 506, weighed 495 grams and had a gestational age of approximately 22 weeks.

Recent developments promise even greater success in overcoming the various respiratory and immunological neonatal complications that stand in the way of increased fetal viability. See, *e. g.*, Beddis, Collins, Levy, Godfrey, & Silverman, New Technique for Servo-Control of Arterial Oxygen Tension in Preterm Infants, 54 Archives of Disease in Childhood 278 (1979). "There is absolutely no question that in the current era there has been a sustained and progressive improvement in the outlook for survival of small premature infants." Stern, Intensive Care of the Pre-Term Infant, 26 Danish Med. Bull. 144 (1979).

cal judgment, skill, and technical ability, and we preserved the flexibility of the term." *Danforth, supra,* at 64.

The *Roe* framework, then, is clearly on a collision course with itself. As the medical risks of various abortion procedures decrease, the point at which the State may regulate for reasons of maternal health is moved further forward to actual childbirth. As medical science becomes better able to provide for the separate existence of the fetus, the point of viability is moved further back toward conception. Moreover, it is clear that the trimester approach violates the fundamental aspiration of judicial decisionmaking through the application of neutral principles "sufficiently absolute to give them roots throughout the community and continuity over significant periods of time . . . ." A. Cox, The Role of the Supreme Court in American Government 114 (1976). The *Roe* framework is inherently tied to the state of medical technology that exists whenever particular litigation ensues. Although legislatures are better suited to make the necessary factual judgments in this area, the Court's framework forces legislatures, as a matter of constitutional law, to speculate about what constitutes "accepted medical practice" at any given time. Without the necessary expertise or ability, courts must then pretend to act as science review boards and examine those legislative judgments.

The Court adheres to the *Roe* framework because the doctrine of *stare decisis* "demands respect in a society governed by the rule of law." *Ante,* at 420. Although respect for *stare decisis* cannot be challenged, "this Court's considered practice [is] not to apply *stare decisis* as rigidly in constitutional as in nonconstitutional cases." *Glidden Co.* v. *Zdanok,* 370 U. S. 530, 543 (1962). Although we must be mindful of the "desirability of continuity of decision in constitutional questions . . . when convinced of former error, this Court has never felt constrained to follow precedent. In constitutional questions, where correction depends upon amendment and not upon legislative action this Court throughout its history

has freely exercised its power to reexamine the basis of its constitutional decisions." *Smith* v. *Allwright*, 321 U. S. 649, 665 (1944) (footnote omitted).

Even assuming that there is a fundamental right to terminate pregnancy in some situations, there is no justification in law or logic for the trimester framework adopted in *Roe* and employed by the Court today on the basis of *stare decisis*. For the reasons stated above, that framework is clearly an unworkable means of balancing the fundamental right and the compelling state interests that are indisputably implicated.

## II

The Court in *Roe* correctly realized that the State has important interests "in the areas of health and medical standards" and that "[t]he State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." 410 U. S., at 149–150. The Court also recognized that the State has "*another* important and legitimate interest in protecting the potentiality of human life." *Id.*, at 162 (emphasis in original). I agree completely that the State has these interests, but in my view, the point at which these interests become compelling does not depend on the trimester of pregnancy. Rather, these interests are present *throughout* pregnancy.

This Court has never failed to recognize that "a State may properly assert important interests in safeguarding health [and] in maintaining medical standards." *Id.*, at 154. It cannot be doubted that as long as a state statute is within "the bounds of reason and [does not] assum[e] the character of a merely arbitrary fiat . . . [then] [t]he State . . . must decide upon measures that are needful for the protection of its people . . . ." *Purity Extract and Tonic Co.* v. *Lynch*, 226 U. S. 192, 204–205 (1912). "There is nothing in the United States Constitution which limits the State's power to require that medical procedures be done safely . . . ." *Sendak* v.

*Arnold,* 429 U. S. 968, 969 (1976) (WHITE, J., dissenting). "The mode and procedure of medical diagnostic procedures is not the business of judges." *Parham* v. *J. R.,* 442 U. S. 584, 607–608 (1979). Under the *Roe* framework, however, the state interest in maternal health cannot become compelling until the onset of the second trimester of pregnancy because "until the end of the first trimester mortality in abortion may be less than mortality in normal childbirth." 410 U. S., at 163. Before the second trimester, the decision to perform an abortion "must be left to the medical judgment of the pregnant woman's attending physician." *Id.,* at 164.[6]

The fallacy inherent in the *Roe* framework is apparent: just because the State has a compelling interest in ensuring maternal safety once an abortion may be more dangerous than childbirth, it simply does not follow that the State has *no* interest before that point that justifies state regulation to ensure that first-trimester abortions are performed as safely as possible.[7]

The state interest in potential human life is likewise extant throughout pregnancy. In *Roe,* the Court held that

---

[6] Interestingly, the Court in *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52 (1976), upheld a recordkeeping requirement as well as the consent provision even though these requirements were imposed on first-trimester abortions and although the State did not impose comparable requirements on most other medical procedures. See *id.,* at 65–67, 79–81. *Danforth,* then, must be understood as a retreat from the position ostensibly adopted in *Roe* that the State had *no* compelling interest in regulation during the first trimester of pregnancy that would justify restrictions imposed on the abortion decision.

[7] For example, the 1982 ACOG Standards, on which the Court relies so heavily in its analysis, provide that physicians performing first-trimester abortions in their offices should provide for prompt emergency treatment or hospitalization in the event of any complications. See ACOG Standards, at 54. ACOG also prescribes that certain equipment be available for office abortions. See *id.,* at 57. I have no doubt that the State has a compelling interest to ensure that these or other requirements are met, and that this legitimate concern would justify state regulation for health reasons even in the first trimester of pregnancy.

although the State had an important and legitimate interest in protecting potential life, that interest could not become compelling until the point at which the fetus was viable. The difficulty with this analysis is clear: *potential* life is no less potential in the first weeks of pregnancy than it is at viability or afterward. At any stage in pregnancy, there is the *potential* for human life. Although the Court refused to "resolve the difficult question of when life begins," *id.*, at 159, the Court chose the point of viability—when the fetus is *capable* of life independent of its mother—to permit the complete proscription of abortion. The choice of viability as the point at which the state interest in *potential* life becomes compelling is no less arbitrary than choosing any point before viability or any point afterward. Accordingly, I believe that the State's interest in protecting potential human life exists throughout the pregnancy.

## III

Although the State possesses compelling interests in the protection of potential human life and in maternal health throughout pregnancy, not every regulation that the State imposes must be measured against the State's compelling interests and examined with strict scrutiny. This Court has acknowledged that "the right in *Roe* v. *Wade* can be understood only by considering both the woman's interest and the nature of the State's interference with it. *Roe* did not declare an unqualified 'constitutional right to an abortion' . . . . Rather, the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy." *Maher*, 432 U. S., at 473–474. The Court and its individual Justices have repeatedly utilized the "unduly burdensome" standard in abortion cases.[8]

---

[8] See *Bellotti* v. *Baird*, 428 U. S. 132, 147 (1976) *(Bellotti I)* (State may not "impose undue burdens upon a minor capable of giving an informed consent." In *Bellotti I*, the Court left open the question whether a judicial hearing would unduly burden the *Roe* right of an adult woman. See 428 U. S., at 147); *Bellotti* v. *Baird*, 443 U. S. 622, 640 (1979) *(Bellotti II)*

462

The requirement that state interference "infringe substantially" or "heavily burden" a right before heightened scrutiny is applied is not novel in our fundamental-rights jurisprudence, or restricted to the abortion context.   In *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1, 37–38 (1973), we observed that we apply "strict judicial scrutiny" only when legislation may be said to have " 'deprived,' 'infringed,' or 'interfered' with the free exercise of some such fundamental personal right or liberty."   If the impact of the regulation does not rise to the level appropriate for our strict scrutiny, then our inquiry is limited to whether the state law bears "some rational relationship to legitimate state purposes."   *Id.*, at 40.   Even in the First Amendment context, we have required in some circumstances that state laws "infringe substantially" on protected conduct, *Gibson* v. *Florida Legislative Investigation Committee*, 372 U. S. 539, 545

(opinion of POWELL, J.) (State may not "unduly burden the right to seek an abortion"); *Harris* v. *McRae*, 448 U. S. 297, 314 (1980) ("The doctrine of *Roe* v. *Wade*, the Court held in *Maher*, 'protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy,' [432 U. S.], at 473–474, such as the severe criminal sanctions at issue in *Roe* v. *Wade*, *supra*, or the absolute requirement of spousal consent for an abortion challenged in *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52"); *Beal* v. *Doe*, 432 U. S. 438, 446 (1977) (The state interest in protecting potential human life "does not, at least until approximately the third trimester, become sufficiently compelling to justify unduly burdensome state interference . . ."); *Carey* v. *Population Services International*, 431 U. S. 678, 705 (1977) (POWELL, J., concurring in part and concurring in judgment) ("In my view, [*Roe* and Griswold* v. *Connecticut*, 381 U. S. 479 (1965),] make clear that the [compelling state interest] standard has been invoked only when the state regulation entirely frustrates or heavily burdens the exercise of constitutional rights in this area.   See *Bellotti* v. *Baird*, 428 U. S. 132, 147 (1976)"). Even though the Court did not explicitly use the "unduly burdensome" standard in evaluating the informed-consent requirement in *Planned Parenthood of Central Missouri* v. *Danforth*, *supra*, the informed-consent requirement for first-trimester abortions in *Danforth* was upheld because it did not "unduly burde[n] the right to seek an abortion."   *Bellotti I*, *supra*, at 147.

(1963), or that there be "a significant encroachment upon personal liberty," *Bates* v. *City of Little Rock*, 361 U. S. 516, 524 (1960).

In *Carey* v. *Population Services International*, 431 U. S. 678 (1977), we eschewed the notion that state law had to meet the exacting "compelling state interest" test "'whenever it implicates sexual freedom.'" *Id.*, at 688, n. 5. Rather, we required that before the "strict scrutiny" standard was employed, it was necessary that the state law "impos[e] a significant burden" on a protected right, *id.*, at 689, or that it "burden an individual's right to decide to prevent conception or terminate pregnancy by *substantially* limiting access to the means of effectuating that decision . . . ." *Id.*, at 688 (emphasis added). The Court stressed that "even a burdensome regulation may be validated by a sufficiently compelling state interest." *Id.*, at 686. Finally, *Griswold* v. *Connecticut*, 381 U. S. 479, 485 (1965), recognized that a law banning the use of contraceptives by married persons had "a maximum destructive impact" on the marital relationship.

Indeed, the Court today follows this approach. Although the Court does not use the expression "undue burden," the Court recognizes that even a "significant obstacle" can be justified by a "reasonable" regulation. See *ante*, at 434, 435, 438.

The "undue burden" required in the abortion cases represents the required threshold inquiry that must be conducted before this Court can require a State to justify its legislative actions under the exacting "compelling state interest" standard. "[A] test so severe that legislation rarely can meet it should be imposed by courts with deliberate restraint in view of the respect that properly should be accorded legislative judgments." *Carey, supra*, at 705 (POWELL, J., concurring in part and concurring in judgment).

The "unduly burdensome" standard is particularly appropriate in the abortion context because of the *nature* and *scope* of the right that is involved. The privacy right involved in the abortion context "cannot be said to be absolute." *Roe,*

410 U. S., at 154. *"Roe* did not declare an unqualified 'constitutional right to an abortion.'" *Maher,* 432 U. S., at 473. Rather, the *Roe* right is intended to protect against state action "drastically limiting the availability and safety of the desired service," *id.,* at 472, against the imposition of an "absolute obstacle" on the abortion decision, *Danforth,* 428 U. S., at 70–71, n. 11, or against "official interference" and "coercive restraint" imposed on the abortion decision, *Harris,* 448 U. S., at 328 (WHITE, J., concurring). That a state regulation may "inhibit" abortions to some degree does not require that we find that the regulation is invalid. See *H. L.* v. *Matheson,* 450 U. S. 398, 413 (1981).

The abortion cases demonstrate that an "undue burden" has been found for the most part in situations involving absolute obstacles or severe limitations on the abortion decision. In *Roe,* the Court invalidated a Texas statute that criminalized *all* abortions except those necessary to save the life of the mother. In *Danforth,* the Court invalidated a state prohibition of abortion by saline amniocentesis because the ban had "the effect of inhibiting . . . the vast majority of abortions after the first 12 weeks." 428 U. S., at 79. The Court today acknowledges that the regulation in *Danforth* effectively represented "a *complete* prohibition on abortions in certain circumstances." *Ante,* at 429, n. 11 (emphasis adued). In *Danforth,* the Court also invalidated state regulations requiring parental or spousal consent as a prerequisite to a first-trimester abortion because the consent requirements effectively and impermissibly delegated a "veto power" to parents and spouses during the first trimester of pregnancy. In both *Bellotti I,* 428 U. S. 132 (1977), and *Bellotti* v. *Baird,* 443 U. S. 622 (1979) *(Bellotti II),* the Court was concerned with effective parental veto over the abortion decision.[9]

---

[9] The only case in which the Court invalidated regulations that were not "undue burdens" was *Doe* v. *Bolton,* 410 U. S. 179 (1973), which was decided on the same day as *Roe.* In *Doe,* the Court invalidated a hospitalization requirement because it covered first-trimester abortion. The Court

In determining whether the State imposes an "undue burden," we must keep in mind that when we are concerned with extremely sensitive issues, such as the one involved here, "the appropriate forum for their resolution in a democracy is the legislature. We should not forget that 'legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.' *Missouri, K. & T. R. Co. v. May*, 194 U. S. 267, 270 (1904) (Holmes, J.)." *Maher*, 432 U. S., at 479–480 (footnote omitted). This does not mean that in determining whether a regulation imposes an "undue burden" on the *Roe* right we defer to the judgments made by state legislatures. "The point is, rather, that when we face a complex problem with many hard questions and few easy answers we do well to pay careful attention to how the other branches of Government have addressed the same problem." *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U. S. 94, 103 (1973).[10]

---

also invalidated a hospital accreditation requirement, a hospital-committee approval requirement, and a two-doctor concurrence requirement. The Court clearly based its disapproval of these requirements on the fact that the State did not impose them on any other medical procedure apart from abortion. But the Court subsequent to *Doe* has expressly rejected the view that differential treatment of abortion requires invalidation of regulations. See *Danforth*, 428 U. S., at 67, 80–81; *Maher* v. *Roe*, 432 U. S. 464, 480 (1977); *Harris*, 448 U. S., at 325. See also *Planned Parenthood Assn. of Kansas City, Mo., Inc.* v. *Ashcroft, post*, p. 476.

[10] In his *amicus curiae* brief in support of the city of Akron, the Solicitor General of the United States argues that we should adopt the "unduly burdensome" standard and in doing so, we should "accord heavy deference to the legislative judgment" in determining what constitutes an "undue burden." See Brief for the United States as *Amicus Curiae* 10. The "unduly burdensome" standard is appropriate *not* because it incorporates deference to legislative judgment at the threshold stage of analysis, but rather because of the limited *nature* of the fundamental right that has been recognized in the abortion cases. Although our cases do require that we "pay careful attention" to the legislative judgment before we invoke strict scrutiny, see *e. g., Columbia Broadcasting System, Inc.* v. *Democratic Na-*

We must always be mindful that "[t]he Constitution does not compel a state to fine-tune its statutes so as to encourage or facilitate abortions. To the contrary, state action 'encouraging childbirth except in the most urgent circumstances' is 'rationally related to the legitimate governmental objective of protecting potential life.' *Harris* v. *McRae*, 448 U. S., at 325. Accord, *Maher* v. *Roe, supra,* at 473–474." *H. L.* v. *Matheson, supra,* at 413 (footnote omitted).

## IV

### A

Section 1870.03 of the Akron ordinance requires that second-trimester abortions be performed in hospitals. The Court holds that this requirement imposes a "significant obstacle" in the form of increased costs and decreased availability of abortions, *ante,* at 434–435, 435, and the Court rejects the argument offered by the State that the requirement is a reasonable health regulation under *Roe,* 410 U. S., at 163. See *ante,* at 435–436.

For the reasons stated above, I find no justification for the trimester approach used by the Court to analyze this restriction. I would apply the "unduly burdensome" test and find that the hospitalization requirement does not impose an undue burden on that decision.

The Court's reliance on increased abortion costs and decreased availability is misplaced. As the city of Akron points out, there is no evidence in this case to show that the two Akron hospitals that performed second-trimester abortions denied an abortion to any woman, or that they would not permit abortion by the D&E procedure. See Reply Brief for Petitioner in No. 81–746, p. 3. In addition, there was no evidence presented that other hospitals in nearby areas did not provide second-trimester abortions. Further, almost *any* state regulation, including the licensing require-

*tional Committee,* 412 U. S., at 103, it is not appropriate to *weigh* the state interests at the threshold stage.

ments that the Court *would* allow, see *ante*, at 437–438, n. 26, inevitably and necessarily entails increased costs for *any* abortion. In *Simopoulos* v. *Virginia, post,* p. 506, the Court upholds the State's stringent licensing requirements that will clearly involve greater cost because the State's licensing scheme "is not an unreasonable means of furthering the State's compelling interest in" preserving maternal health. *Post,* at 519. Although the Court acknowledges this indisputably correct notion in *Simopoulos,* it inexplicably refuses to apply it in this case. A health regulation, such as the hospitalization requirement, simply does not rise to the level of "official interference" with the abortion decision. See *Harris, supra,* at 328 (WHITE, J., concurring).

Health-related factors that may legitimately be considered by the State go well beyond what various medical organizations have to say about the *physical* safety of a particular procedure. Indeed, "all factors—physical, emotional, psychological, familial, and the woman's age—[are] relevant to the well-being of the patient." *Doe* v. *Bolton,* 410 U. S. 179, 192 (1973). The ACOG Standards, upon which the Court relies, state that "[r]egardless of advances in abortion technology, midtrimester terminations will likely remain more hazardous, expensive, and emotionally disturbing for a woman than early abortions." American College of Obstetricians and Gynecologists, Technical Bulletin No. 56: Methods of Midtrimester Abortion 4 (Dec. 1979).

The hospitalization requirement does not impose an undue burden, and it is not necessary to apply an exacting standard of review. Further, the regulation has a "rational relation" to a valid state objective of ensuring the health and welfare of its citizens. See *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 491 (1955).[11]

---

[11] The Court has never required that state regulation that burdens the abortion decision be "narrowly drawn" to express only the relevant state interest. In *Roe,* the Court mentioned "narrowly drawn" legislative enactments, 410 U. S., at 155, but the Court never actually adopted this

B

Section 1870.05(B)(2) of the Akron ordinance provides that no physician shall perform an abortion on a minor under 15 years of age unless the minor gives written consent, and the physician first obtains the informed written consent of a parent or guardian, or unless the minor first obtains "an order from a court having jurisdiction over her that the abortion be performed or induced." Despite the fact that this regulation has yet to be construed in the state courts, the Court holds that the regulation is unconstitutional because it is not "reasonably susceptible of being construed to create an 'opportunity for case-by-case evaluations of the maturity of pregnant minors.'" *Ante*, at 441 (quoting *Bellotti II*, 443 U. S., at 643–644, n. 23 (plurality opinion)). I believe that the Court should have abstained from declaring the ordinance unconstitutional.

In *Bellotti I*, the Court abstained from deciding whether a state parental consent provision was unconstitutional as

---

standard in the *Roe* analysis. In its decision today, the Court fully endorses the *Roe* requirement that a burdensome health regulation, or as the Court appears to call it, a "significant obstacle," *ante*, at 434, be "reasonably related" to the state compelling interest. See *ante*, at 430–431, 435, 438. The Court recognizes that "[a] State necessarily must have latitude in adopting regulations of general applicability in this sensitive area." *Ante*, at 434. See also *Simopoulos* v. *Virginia*, *post*, at 516. Nevertheless, the Court fails to apply the "reasonably related" standard. The hospitalization requirement "reasonably relates" to its compelling interest in protection and preservation of maternal health under any normal understanding of what "reasonably relates" signifies.

The Court concludes that the regulation must fall because "it appears that during a substantial portion of the second trimester the State's regulation 'depart[s] from accepted medical practice.'" *Ante*, at 434. It is difficult to see how the Court concludes that the regulation "depart[s] from accepted medical practice" during "a substantial portion of the second trimester," *ibid.*, in light of the fact that the Court concludes that D&E abortions may be performed safely in an outpatient clinic through 16 weeks, or 4 weeks into the second trimester. *Ante*, at 436–437. Four weeks is hardly a "substantial portion" of the second trimester.

applied to mature minors.   The Court recognized and re-
spected the well-settled rule that abstention is proper "where
an unconstrued state statute is susceptible of a construction
by the state judiciary 'which might avoid in whole or in part
the necessity for federal constitutional adjudication, or at
least materially change the nature of the problem.'"   428
U. S., at 147 (quoting *Harrison* v. *NAACP*, 360 U. S. 167,
177 (1959)).   While acknowledging the force of the abstention
doctrine, see *ante*, at 440–441, the Court nevertheless de-
clines to apply it.   Instead, it speculates that a state juvenile
court *might* inquire into a minor's maturity and ability to decide
to have an abortion in deciding whether the minor is being
provided "'surgical care . . . necessary for his health, morals,
or well being,'" *ante* at 441, n. 31 (quoting Ohio Rev. Code Ann.
§ 2151.03 (1976)).   The Court ultimately rejects this possible
interpretation of state law, however, because filing a petition
in juvenile court requires parental notification, an unconstitu-
tional condition insofar as mature minors are concerned.

Assuming, *arguendo*, that the Court is correct in holding
that a parental notification requirement would be unconstitu-
tional as applied to mature minors,[12] I see no reason to as-
sume that the Akron ordinance and the State Juvenile Court
statute compel state judges to notify the parents of a mature
minor if such notification was contrary to the minor's best in-
terests.   Further, there is no reason to believe that the state

___

[12] In my view, no decision of this Court has yet held that parental notifi-
cation in the case of mature minors is unconstitutional.   Although the plu-
rality opinion of JUSTICE POWELL in *Bellotti II* suggested that the state
statute in that case was unconstitutional because, *inter alia*, it failed to
provide *all* minors with an opportunity "to go directly to a court without
first consulting or notifying her parents," 443 U. S., at 647, the Court in
*H. L.* v. *Matheson* held that *unemancipated and immature* minors had
"no constitutional right to notify a court in lieu of notifying their parents."
450 U. S., at 412, n. 22.   Furthermore, the Court in *H. L.* v. *Matheson*
expressly did *not* decide that a parental notification requirement would be
unconstitutional if the State otherwise permitted *mature* minors to make
abortion decisions free of parental or judicial "veto."   See *id.*, at 406–407.

courts would construe the consent requirement to impose any type of parental or judicial veto on the abortion decisions of mature minors. In light of the Court's complete lack of knowledge about how the Akron ordinance will operate, and how the Akron ordinance and the State Juvenile Court statute interact, our "'scrupulous regard for the rightful independence of state governments'" counsels against "unnecessary interference by the federal courts with proper and validly administered state concerns, a course so essential to the balanced working of our federal system." *Harrison* v. *NAACP, supra,* at 176 (quoting *Matthews* v. *Rodgers,* 284 U. S. 521, 525 (1932)).

## C

The Court invalidates the informed-consent provisions of § 1870.06(B) and § 1870.06(C) of the Akron ordinance.[13] Although it finds that subsections (1), (2), (6), and (7) of § 1870.06(B) are "certainly . . . not objectionable," *ante,* at 445–446, n. 37, it refuses to sever those provisions from subsections (3), (4), and (5) because the city requires that the "acceptable" information be provided by the attending physician when "much, if not all of it, could be given by a qualified person assisting the physician," *ibid.* Despite the fact that the Court finds that § 1870.06(C) "properly leaves the precise nature and amount of . . . disclosure to the physician's discre-

---

[13] Section 1870.06(B) requires that the attending physician orally inform the pregnant woman: (1) that she is pregnant; (2) of the probable number of weeks since conception; (3) that the unborn child is a human being from the moment of conception, and has certain anatomical and physiological characteristics; (4) that the unborn child may be viable and, if so, the physician has a legal responsibility to try to save the child; (5) that abortion is a major surgical procedure that can result in serious physical and psychological complications; (6) that various agencies exist that will provide the pregnant woman with information about birth control; and (7) that various agencies exist that will assist the woman through pregnancy should she decide not to undergo the abortion. Section 1870.06(C) requires the attending physician to inform the woman of risks associated with her particular pregnancy and proposed abortion technique, as well as to furnish information that the physician deems relevant "in his own medical judgment."

tion and 'medical judgment,'" *ante*, at 447, the Court also finds § 1870.06(C) unconstitutional because it requires that the disclosure be made by the attending physician, rather than by other "qualified persons" who work at abortion clinics.

We have approved informed-consent provisions in the past even though the physician was required to deliver certain information to the patient. In *Danforth*, the Court upheld a state informed-consent requirement because "[t]he decision to abort, indeed, is an important, and often a stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and consequences." 428 U. S., at 67.[14] In *H. L.* v. *Matheson*, the Court noted that the state statute in the case required that the patient "be advised at a minimum about available adoption services, about fetal development, and about foreseeable complications and risks of an abortion. See Utah Code Ann. § 76–7–305 (1978). In *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52, 65–67 (1976), we rejected a constitutional attack on written consent provisions." 450 U. S., at 400–401, n. 1. Indeed, we have held that an informed-consent provision does not "unduly burde[n] the right to seek an abortion." *Bellotti I*, 428 U. S., at 147.[15]

The validity of subsections (3), (4), and (5) is not before the Court because it appears that the city of Akron conceded their unconstitutionality before the court below. See Brief

---

[14] The Court in *Danforth* did not even view the informed-consent requirement as having a "legally significant impact" on first-trimester abortions that would trigger the *Roe* and *Doe* proscriptions against state interference in the decision to seek a first-trimester abortion. See 428 U. S., at 81 (recordkeeping requirements).

[15] Assuming, *arguendo*, that the Court now decides that *Danforth*, *Bellotti II*, and *H. L.* v. *Matheson* were incorrect, and that the informed-consent provisions do burden the right to seek an abortion, the Court inexplicably refuses to determine whether this "burden" "reasonably relates" to legitimate state interests. *Ante*, at 430 (quoting *Roe*, 410 U. S., at 163). Rather, the Court now decides that an informed-consent provision must be justified by a "vital state need" before it can be upheld. See *ante*, at 448.

for City of Akron in No. 79–3757 (CA6), p. 35; Reply Brief for City of Akron in No. 79–3757 (CA6), pp. 5–9. In my view, the remaining subsections of § 1870.06(B) are separable from the subsections conceded to be unconstitutional. Section 1870.19 contains a separability clause which creates a "'presumption of divisibility'" and places "the burden . . . on the litigant who would escape its operation." *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 335 (1936) (opinion of Cardozo, J.). Akron Center has failed to show that severance of subsections (3), (4), and (5) would "create a program quite different from the one the legislature actually adopted." *Sloan* v. *Lemon*, 413 U. S. 825, 834 (1973).

The remainder of § 1870.06(B), and § 1870.06(C), impose no undue burden or drastic limitation on the abortion decision. The city of Akron is merely attempting to ensure that the decision to abort is made in light of that knowledge that the city deems relevant to informed choice. As such, these regulations do not impermissibly affect any privacy right under the Fourteenth Amendment.[16]

D

Section 1870.07 of the Akron ordinance requires a 24-hour waiting period between the signing of a consent form and the actual performance of the abortion, except in cases of emergency. See § 1870.12. The court below invalidated this requirement because it affected abortion decisions during the first trimester of pregnancy. The Court affirms the decision below, not on the ground that it affects early abortions, but because "Akron has failed to demonstrate that any legitimate state interest is furthered by an arbitrary and inflexible wait-

---

[16] This is not to say that the informed-consent provisions may not violate the First Amendment rights of the physician if the State requires him or her to communicate its ideology. See *Wooley* v. *Maynard*, 430 U. S. 705 (1977). However, it does not appear that Akron Center raised any First Amendment argument in the court below. See Brief for Akron Center for Reproductive Health, Inc., in No. 79–3701 (CA6), pp. 18–23; Reply Brief for Akron Center for Reproductive Health, Inc., in No. 79–3701 (CA6), pp. 26–33.

ing period." *Ante,* at 450. The Court accepts the arguments made by Akron Center that the waiting period increases the costs of obtaining an abortion by requiring the pregnant woman to make two trips to the clinic, and increases the risks of abortion through delay and scheduling difficulties. The decision whether to proceed should be left to the physician's "'discretion in the exercise of his medical judgment.'" *Ibid.* (quoting *Colautti,* 439 U. S., at 387).

It is certainly difficult to understand how the Court believes that the physician-patient relationship is able to accommodate any interest that the State has in maternal physical and mental well-being in light of the fact that the record in this case shows that the relationship is nonexistent. See 651 F. 2d, at 1217 (Kennedy, J., concurring in part and dissenting in part). It is also interesting to note that the American College of Obstetricians and Gynecologists recommends that "[p]rior to abortion, the woman should have access to special counseling that explores options for the management of an unwanted pregnancy, examines the risks, and allows sufficient time for reflection prior to making an informed decision." 1982 ACOG Standards for Obstetric-Gynecologic Services, at 54.

The waiting period does not apply in cases of medical emergency. Therefore, should the physician determine that the waiting period would increase risks significantly, he or she need not require the woman to wait. The Court's concern in this respect is simply misplaced. Although the waiting period may impose an additional cost on the abortion decision, this increased cost does not unduly burden the availability of abortions or impose an absolute obstacle to access to abortions. Further, the State is not required to "fine-tune" its abortion statutes so as to minimize the costs of abortions. *H. L.* v. *Matheson,* 450 U. S., at 413.

Assuming, *arguendo,* that any additional costs are such as to impose an undue burden on the abortion decision, the State's compelling interests in maternal physical and mental

health and protection of fetal life clearly justify the waiting period. As we acknowledged in *Danforth*, 428 U. S., at 67, the decision to abort is "a stressful one," and the waiting period reasonably relates to the State's interest in ensuring that a woman does not make this serious decision in undue haste. The decision also has grave consequences for the fetus, whose life the State has a compelling interest to protect and preserve. "[N]o other [medical] procedure involves the purposeful termination of a potential life." *Harris*, 448 U. S., at 325. The waiting period is surely a small cost to impose to ensure that the woman's decision is well considered in light of its certain and irreparable consequences on fetal life, and the possible effects on her own.[17]

### E

Finally, § 1870.16 of the Akron ordinance requires that "[a]ny physician who shall perform or induce an abortion upon a pregnant woman shall insure that the remains of the unborn child are disposed of in a humane and sanitary manner." The Court finds this provision void for vagueness. I disagree.

In *Planned Parenthood Assn.* v. *Fitzpatrick*, 401 F. Supp. 554 (ED Pa. 1975) (three-judge court), summarily aff'd *sub nom. Franklin* v. *Fitzpatrick*, 428 U. S. 901 (1976), the District Court upheld a "humane disposal" provision against a vagueness attack in light of the State's representation that the intent of the Act " 'is to preclude the mindless dumping of

---

[17] On the basis of this analysis of the waiting-period requirement, the Court charges that "the dissent would uphold virtually any abortion-inhibiting regulation . . . ." *Ante*, at 421, n. 1. The waiting-period requirement is valid because it imposes a small cost when all relevant factors are taken into consideration. This is precisely the reasoning that JUSTICE POWELL employs in upholding the pathology-report requirement in *Planned Parenthood Assn. of Kansas City, Mo., Inc.* v. *Ashcroft, post*, p. 476 (report requirement imposes a "comparatively small additional cost," *post*, at 489).

aborted fetuses onto garbage piles.'" 401 F. Supp., at 573. The District Court held that different concerns would be implicated if the statute were, at some point, determined to require "expensive burial." *Ibid.* In the present cases, the city of Akron has informed this Court that the intent of the "humane" portion of its statute, as distinguished from the "sanitary" portion, is merely to ensure that fetuses will not be "'dump[ed] . . . on garbage piles.'" Brief for Petitioner in No. 81–746, p. 48. In light of the fact that the city of Akron indicates no intent to require that physicians provide "decent burials" for fetuses, and that "humane" is no more vague than the term "sanitary," the vagueness of which Akron Center does not question, I cannot conclude that the statute is void for vagueness.

## V

For the reasons set forth above, I dissent from the judgment of the Court in these cases.